*472 Justice Stevens
delivered the opinion of the Court.
In 2000, the city of New London approved a development plan that, in the words of the Supreme Court of Connecticut, was “projected to create in excess of 1,000 jobs, to increase tax and other revenues, and to revitalize an economically distressed city, including its downtown and waterfront areas.” 268 Conn. 1, 5, 848 A. 2d 500, 507 (2004). In assembling the land needed for this project, the city’s development agent has purchased property from willing sellers and proposes to use the power of eminent domain to acquire the remainder of the property from unwilling owners in exchange for just compensation. The question presented is whether the city’s proposed disposition of this property qualifies as a “public use” within the meaning of the Takings Clause of the Fifth Amendment to the Constitution.[1]
*473 > — I
The city of New London (hereinafter City) sits at the junction of the Thames River and the Long Island Sound in southeastern Connecticut. Decades of economic decline led a state agency in 1990 to designate the City a “distressed municipality.” In 1996, the Federal Government closed the Naval Undersea Warfare Center, which had been located in the Fort Trumbull area of the City and had employed over 1,500 people. In 1998, the City’s unemployment rate was nearly double that of the State, and its population of just under 24,000 residents was at its lowest since 1920.
These conditions prompted state and local officials to target New London, and particularly its Fort Trumbull area, for economic revitalization. To this end, respondent New London Development Corporation (NLDC), a private nonprofit entity established some years earlier to assist the City in planning economic development, was reactivated. In January 1998, the State authorized a $5.35 million bond issue to support the NLDC’s planning activities and a $10 million bond issue toward the creation of a Fort Trumbull State Park. In February, the pharmaceutical company Pfizer Inc. announced that it would build a $800 million research facility on a site immediately adjacent to Fort Trumbull; local planners hoped that Pfizer would draw new business to the area, thereby serving as a catalyst to the area’s rejuvenation. After receiving initial approval from the city council, the NLDC continued its planning activities and held a series of neighborhood meetings to educate the public about the process. In May, the city council authorized the NLDC to formally submit its plans to the relevant state agencies for review.[2] Upon obtaining state-level approval, the NLDC *474 finalized an integrated development plan focused on 90 acres of the Fort Trumbull area.
The Fort Trumbull area is situated on a peninsula that juts into the Thames River. The area comprises approximately 115 privately owned properties, as well as the 32 acres of land formerly occupied by the naval facility (Trumbull State Park now occupies 18 of those 32 acres). The development plan encompasses seven parcels. Parcel 1 is designated for a waterfront conference hotel at the center of a “small urban village” that will include restaurants and shopping. This parcel will also have marinas for both recreational and commercial uses. A pedestrian “riverwalk” will originate here and continue down the coast, connecting the waterfront areas of the development. Parcel 2 will be the site of approximately 80 new residences organized into an urban neighborhood and linked by public walkway to the remainder of the development, including the state park. This parcel also includes space reserved for a new U. S. Coast Guard Museum. Parcel 3, which is located immediately north of the Pfizer facility, will contain at least 90,000 square feet of research and development office space. Parcel 4A is a 2.4-acre site that will be used either to support the adjacent state park, by providing parking or retail services for visitors, or to support the nearby marina. Parcel 4B will include a renovated marina, as well as the final stretch of the riverwalk. Parcels 5, 6, and 7 will provide land for office and retail space, parking, and water-dependent commercial uses. App. 109-113.
The NLDC intended the development plan to capitalize on the arrival of the Pfizer facility and the new commerce it was expected to attract. In addition to creating jobs, generating tax revenue, and helping to “build momentum for the revitalization of downtown New London,” id., at 92, the plan was also designed to make the City more attractive and to create *475 leisure and recreational opportunities on the waterfront and in the park.
The city council approved the plan in January 2000, and designated the NLDC as its development agent in charge of implementation. See Conn. Gen. Stat. § 8-188 (2005). The city council also authorized the NLDC to purchase property or to acquire property by exercising eminent domain in the City’s name. §8-193. The NLDC successfully negotiated the purchase of most of the real estate in the 90-acre area, but its negotiations with petitioners failed. As a consequence, in November 2000, the NLDC initiated the condemnation proceedings that gave rise to this case.[3]
I — I HH
Petitioner Susette Kelo has lived in the Fort Trumbull area since 1997. She has made extensive improvements to her house, which she prizes for its water view. Petitioner Wilhelmina Dery was born in her Fort Trumbull house in 1918 and has lived there her entire life. Her husband Charles (also a petitioner) has lived in the house since they married some 60 years ago. In all, the nine petitioners own 15 properties in Fort Trumbull — 4 in parcel 3 of the development plan and 11 in parcel 4A. Ten of the parcels are occupied by the owner or a family member; the other five are held as investment properties. There is no allegation that any of these properties is blighted or otherwise in poor condition; rather, they were condemned only because they happen to be located in the development area.
In December 2000, petitioners brought this action in the New London Superior Court. They claimed, among other things, that the taking of their properties would violate the “public use” restriction in the Fifth Amendment. After a 7-day bench trial, the Superior Court granted a permanent restraining order prohibiting the taking of the properties lo *476 cated in parcel 4A (park or marina support). It, however, denied petitioners relief as to the properties located in parcel 3 (office space). App. to Pet. for Cert. 343-350.[4]
After the Superior Court ruled, both sides took appeals to the Supreme Court of Connecticut. That court held, over a dissent, that all of the City’s proposed takings were valid. It began by upholding the lower court’s determination that the takings were authorized by chapter 132, the State’s municipal development statute. See Conn. Gen. Stat. § 8-186 et seq. (2005). That statute expresses a legislative determination that the taking of land, even developed land, as part of an economic development project is a “public use” and in the “public interest.” 268 Conn., at 18-28, 843 A. 2d, at 515-521. Next, relying on cases such as Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984), and Berman v. Parker, 348 U. S. 26 (1954), the court held that such economic development qualified as a valid public use under both the Federal and State Constitutions. 268 Conn., at 40, 843 A. 2d, at 527.
Finally, adhering to its precedents, the court went on to determine, first, whether the takings of the particular properties at issue were “reasonably necessary” to achieving the City’s intended public use, id., at 82-84, 843 A. 2d, at 552-553, and, second, whether the takings were for “reasonably foreseeable needs,” id., at 93-94, 843 A. 2d, at 558-559. The court upheld the trial court’s factual findings as to parcel 3, but reversed the trial court as to parcel 4A, agreeing with the City that the intended use of this land was sufficiently *477 definite and had been given “reasonable attention” during the planning process. Id., at 120-121, 843 A. 2d, at 574.
The three dissenting justices would have imposed a “heightened” standard of judicial review for takings justified by economic development. Although they agreed that the plan was intended to serve a valid public use, they would have found all the takings unconstitutional because the City had failed to adduce “clear and convincing evidence” that the economic benefits of the plan would in fact come to pass. Id., at 144, 146, 843 A. 2d, at 587, 588 (Zarella, J., joined by Sullivan, C. J., and Katz, J., concurring in part and dissenting in part).
We granted certiorari to determine whether a city’s decision to take property for the purpose of economic development satisfies the “public use” requirement of the Fifth Amendment. 542 U. S. 965 (2004).
Two polar propositions are perfectly clear. On the one hand, it has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation. On the other hand, it is equally clear that a State may transfer property from one private party to another if future “use by the public” is the purpose of the taking; the condemnation of land for a railroad with common-carrier duties is a familiar example. Neither of these propositions, however, determines the disposition of this case.
As for the first proposition, the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. See Midkiff, 467 U. S., at 245 (“A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void”); Missouri Pacific R. Co. v. Nebraska, *478 164 U. S. 403 (1896).[5] Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit. The takings before us, however, would be executed pursuant to a “carefully considered” development plan. 268 Conn., at 54, 843 A. 2d, at 536. The trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case.[6] Therefore, as was true of the statute challenged in Midkiff, 467 U. S., at 245, the City’s development plan was not adopted “to benefit a particular class of identifiable individuals.”
On the other hand, this is not a case in which the City is planning to open the condemned land — at least not in its entirety — to use by the general public. Nor will the private lessees of the land in any sense be required to operate like common carriers, making their services available to all com *479 ers. But although such a projected use would be sufficient to satisfy the public use requirement, this “Court long ago rejected any literal requirement that condemned property be put into use for the general public.” Id., at 244. Indeed, while many state courts in the mid-19th century endorsed “use by the public” as the proper definition of public use, that narrow view steadily eroded over time. Not only was the “use by the public” test difficult to administer (e. g., what proportion of the public need have access to the property? at what price?),[7] but it proved to be impractical given the diverse and always evolving needs of society.[8] Accordingly, *480 when this Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the broader and more natural interpretation of public use as “public purpose.” See, e. g., Fallbrook Irrigation Dist. v. Bradley, 164 U. S. 112, 158-164 (1896). Thus, in a case upholding a mining company’s use of an aerial bucket line to transport ore over property it did not own, Justice Holmes’ opinion for the Court stressed “the inadequacy of use by the general public as a universal test.” Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 531 (1906).[9] We have repeatedly and consistently rejected that narrow test ever since.[10]
The disposition of this case therefore turns on the question whether the City’s development plan serves a “public purpose.” Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field.
In Berman v. Parker, 348 U. S. 26 (1954), this Court upheld a redevelopment plan targeting a blighted area of Washington, D. C., in which most of the housing for the area’s 5,000 inhabitants was beyond repair. Under the plan, the area would be condemned and part of it utilized for the construction of streets, schools, and other public facilities. The remainder of the land would be leased or sold to private parties for the purpose of redevelopment, including the construction of low-cost housing.
*481 The owner of a department store located in the area challenged the condemnation, pointing out that his store was not itself blighted and arguing that the creation of a “better balanced, more attractive community” was not a valid public use. Id., at 31. Writing for a unanimous Court, Justice Douglas refused to evaluate this claim in isolation, deferring instead to the legislative and agency judgment that the area “must be planned as a whole” for the plan to be successful. Id., at 34. The Court explained that “community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis — lot by lot, building by building.” Id., at 35. The public use underlying the taking was unequivocally affirmed:
“We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. .. . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation’s Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.” Id., at 33.
In Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984), the Court considered a Hawaii statute whereby fee title was taken from lessors and transferred to lessees (for just compensation) in order to reduce the concentration of land ownership. We unanimously upheld the statute and rejected the Ninth Circuit’s view that it was “a naked attempt on the part of the state of Hawaii to take the property of A *482 and transfer it to B solely for B’s private use and benefit.” Id., at 235 (internal quotation marks omitted). Reaffirming Berman’s deferential approach to legislative judgments in this field, we concluded that the State’s purpose of eliminating the “social and economic evils of a land oligopoly” qualified as a valid public use. 467 U. S., at 241-242. Our opinion also rejected the contention that the mere fact that the State immediately transferred the properties to private individuals upon condemnation somehow diminished the public character of the taking. “[I]t is only the taking’s purpose, and not its mechanics,” we explained, that matters in determining public use. Id., at 244.
In that same Term we decided another public use case that arose in a purely economic context. In Ruckelskaus v. Monsanto Co., 467 U. S. 986 (1984), the Court dealt with provisions of the Federal Insecticide, Fungicide, and Rodenti-cide Act under which the Environmental Protection Agency could consider the data (including trade secrets) submitted by a prior pesticide applicant in evaluating a subsequent application, so long as the second applicant paid just compensation for the data. We acknowledged that the “most direct beneficiaries” of these provisions were the subsequent applicants, id., at 1014, but we nevertheless upheld the statute under Berman and MidJciff. We found sufficient Congress’ belief that sparing applicants the cost of time-consuming research eliminated a significant barrier to entry in the pesticide market and thereby enhanced competition. 467 U. S., at 1015.
Viewed as a whole, our jurisprudence has recognized that the needs of society have varied between different parts of the Nation, just as they have evolved over time in response to changed circumstances. Our earliest cases in particular embodied a strong theme of federalism, emphasizing the “great respect” that we owe to state legislatures and state courts in discerning local public needs. See Hairston v. Danville & Western R. Co., 208 U. S. 598, 606-607 (1908) *483 (noting that these needs were likely to vary depending on a State’s “resources, the capacity of the soil, the relative importance of industries to the general public welfare, and the long-established methods and habits of the people”).[11] For more than a century, our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power.
IV
Those who govern the City were not confronted with the need to remove blight in the Fort Trumbull area, but their determination that the area was sufficiently distressed to justify a program of economic rejuvenation is entitled to our deference. The City has carefully formulated an economic development plan that it believes will provide appreciable benefits to the community, including — but by no means limited to — new jobs and increased tax revenue. As with other exercises in urban planning and development,[12] the City is endeavoring to coordinate a variety of commercial, residential, and recreational uses of land, with the hope that they will form a whole greater than the sum of its parts. To ef *484 fectuate this plan, the City has invoked a state statute that specifically authorizes the use of eminent domain to promote economic development. Given the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us, as it was in Berman, to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan. Because that plan unquestionably serves a public purpose, the takings challenged here satisfy the public use requirement of the Fifth Amendment.
To avoid this result, petitioners urge us to adopt a new bright-line rule that economic development does not qualify as a public use. Putting aside the unpersuasive suggestion that the City’s plan will provide only purely economic benefits, neither precedent nor logic supports petitioners’ proposal. Promoting economic development is a traditional and long-accepted function of government. There is, moreover, no principled way of distinguishing economic development from the other public purposes that we have recognized. In our cases upholding takings that facilitated agriculture and mining, for example, we emphasized the importance of those industries to the welfare of the States in question, see, e. g., Strickley, 200 U. S. 527; in Berman, we endorsed the purpose of transforming a blighted area into a “well-balanced” community through redevelopment, 348 U. S., at 33;[13] in Midkiff, *485 we upheld the interest in breaking up a land oligopoly that “created artificial deterrents to the normal functioning of the State’s residential land market,” 467 U. S., at 242; and in Monsanto, we accepted Congress’ purpose of eliminating a “significant barrier to entry in the pesticide market,” 467 U. S., at 1014-1015. It would be incongruous to hold that the City’s interest in the economic benefits to be derived from the development of the Fort Trumbull area has less of a public character than any of those other interests. Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose.
Petitioners contend that using eminent domain for economic development impermissibly blurs the boundary between public and private takings. Again, our cases foreclose this objection. Quite simply, the government’s pursuit of a public purpose will often benefit individual private parties. For example, in Midkiff, the forced transfer of property conferred a direct and significant benefit on those lessees who were previously unable to purchase their homes. In Monsanto, we recognized that the “most direct beneficiaries” of the data-sharing provisions were the subsequent pesticide applicants, but benefiting them in this way was necessary to promoting competition in the pesticide market. 467 U. S., at 1014.[14] The owner of the department store in *486 Berman objected to “taking from one businessman for the benefit of another businessman,” 348 U. S., at 33, referring to the fact that under the redevelopment plan land would be leased or sold to private developers for redevelopment.[15] Our rejection of that contention has particular relevance to the instant case: “The public end may be as well or better served through an agency of private enterprise than through a department of government — or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects.” Id., at 33-34.[16]
It is further argued that without a bright-line rule nothing would stop a city from transferring citizen As property to *487 citizen B for the sole reason that citizen B will put the property to a more productive use and thus pay more taxes. Such a one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case. While such an unusual exercise of government power would certainly raise a suspicion that a private purpose was afoot,[17] the hypothetical cases posited by petitioners can be confronted if and when they arise.[18] They do not warrant the crafting of an artificial restriction on the concept of public use.[19]
Alternatively, petitioners maintain that for takings of this kind we should require a “reasonable certainty” that the expected public benefits will actually accrue. Such a rule, however, would represent an even greater departure from *488 our precedent. “When the legislature’s purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings — no less than debates over the wisdom of other kinds of socioeconomic legislation — are not to be carried out in the federal courts.” Midkiff, 467 U. S., at 242-243.[20] Indeed, earlier this Term we explained why similar practical concerns (among others) undermined the use of the “substantially advances” formula in our regulatory takings doctrine. See Lingle v. Chevron U. S. A. Inc., 544 U. S. 528, 544 (2005) (noting that this formula “would empower — and might often require — courts to substitute their predictive judgments for those of elected legislatures and expert agencies”). The disadvantages of a heightened form of review are especially pronounced in this type of case. Orderly implementation of a comprehensive redevelopment plan obviously requires that the legal rights of all interested parties be established before new construction can be commenced. A constitutional rule that required postponement of the judicial approval of every condemnation until the likelihood of success of the plan had been assured would unquestionably impose a significant impediment to the successful consummation of many such plans.
Just as we decline to second-guess the City’s considered judgments about the efficacy of its development plan, we also decline to second-guess the City’s determinations as to what *489 lands it needs to acquire in order to effectuate the project. “It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.” Berman, 348 U. S., at 35-36.
In affirming the City’s authority to take petitioners’ properties, we do not minimize the hardship that condemnations may entail, notwithstanding the payment of just compensation.[21] We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many States already impose “public use” requirements that are stricter than the federal baseline. Some of these requirements have been established as a matter of state constitutional law,[22] while others are expressed in state eminent domain statutes that carefully limit the grounds upon which takings may be exercised.[23] As the submissions of the parties and their amici make clear, the necessity and wisdom of using eminent domain to promote economic development are certainly matters of legitimate public debate.[24] This Court’s authority, *490 however, extends only to determining whether the City’s proposed condemnations are for a “public use” within the meaning of the Fifth Amendment to the Federal Constitution. Because over a century of our ease law interpreting that provision dictates an affirmative answer to that question, we may not grant petitioners the relief that they seek.
The judgment of the Supreme Court of Connecticut is affirmed.

It is so ordered.

 “[N]or shall private property be taken for public use, without just compensation.” U. S. Const., Amdt. 5. That Clause is made applicable to the States by the Fourteenth Amendment. See Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226 (1897).

 Various state agencies studied the project’s economic, environmental, and social ramifications. As part of this process, a team of consultants evaluated six alternative development proposals for the area, which varied in extensiveness and emphasis. The Office of Policy and Management, one of the primary state agencies undertaking the review, made findings *474 that the project was consistent with relevant state and municipal development policies. See App. 89-95.

 In the remainder of the opinion we will differentiate between the City and the NLDC only where necessary.

 While this litigation was pending before the Superior Court, the NLDC announced that it would lease some of the parcels to private developers in exchange for their agreement to develop the land according to the terms of the development plan. Specifically, the NLDC was negotiating a 99-year ground lease with Corcoran Jennison, a developer selected from a group of applicants. The negotiations contemplated a nominal rent of $1 per year, but no agreement had yet been signed. See 268 Conn. 1, 9, 61, 843 A. 2d 500, 509-510, 540 (2004).

 See also Calder v. Bull, 3 Dall. 386, 388 (1798) (“An act of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority.... A few instances will suffice to explain what I mean.... [A] law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with such powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them” (emphasis deleted)).

 See 268 Conn., at 159, 843 A. 2d, at 595 (Zarella, J., concurring in part and dissenting in part) (“The record clearly demonstrates that the development plan was not intended to serve the interests of Pfizer, Inc., or any other private entity, but rather, to revitalize the local economy by creating temporary and permanent jobs, generating a significant increase in tax revenue, encouraging spin-off economic activities and maximizing public access to the waterfront”). And while the City intends to transfer certain of the parcels to a private developer in a long-term lease — which developer, in turn, is expected to lease the office space and so forth to other private tenants — -the identities of those private parties were not known when the plan was adopted. It is, of course, difficult to accuse the government of having taken A’s property to benefit the private interests of B when the identity of B was unknown.

 See, e.g., Dayton Gold & Silver Mining Co. v. Seawell, 11 Nev. 394, 410, 1876 WL 4573, *11 (1876) (“If public occupation and enjoyment of the object for which land is to be condemned furnishes the only and true test for the right of eminent domain, then the legislature would certainly have the constitutional authority to condemn the lands of any private citizen for the purpose of building hotels and theaters. Why not? A hotel is used by the public as much as a railroad. The public have the same right, upon payment of a fixed compensation, to seek rest and refreshment at a public inn as they have to travel upon a railroad”).

 From upholding the Mill Acts (which authorized manufacturers dependent on power-producing dams to flood upstream lands in exchange for just compensation), to approving takings necessary for the economic development of the West through mining and irrigation, many state courts either circumvented the “use by the public” test when necessary or abandoned it completely. See Nichols, The Meaning of Public Use in the Law of Eminent Domain, 20 B. U. L. Rev. 615, 619-624 (1940) (tracing this development and collecting cases). For example, in rejecting the “use by the public” test as overly restrictive, the Nevada Supreme Court stressed that “[mining is the greatest of the industrial pursuits in this state. All other interests are subservient to it. Our mountains are almost barren of timber, and our valleys could never be made profitable for agricultural purposes except for the fact of a home market having been created by the mining developments in different sections of the state. The mining and milling interests give employment to many men, and the benefits derived from this business are distributed as much, and sometimes more, among the laboring classes than with the owners of the mines and mills... . The present prosperity of the state is entirely due to the mining developments already made, and the entire people of the state are directly interested in having the future developments unobstructed by the obstinate action of *480 any individual or individuals.” Dayton Gold & Silver Mining Co., 11 Nev., at 409-410, 1876 WL, at *11.

 See also Clark v. Nash, 198 U. S. 361 (1905) (upholding a statute that authorized the owner of arid land to widen a ditch on his neighbor’s property so as to permit a nearby stream to irrigate his land).

 See, e. g., Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U. S. 30, 32 (1916) (“The inadequacy of use by the general public as a universal test is established”); Ruckelshaus v. Monsanto Co., 467 U. S. 986, 1014-1015 (1984) (“This Court, however, has rejected the notion that a use is a public use only if the property taken is put to use for the general public”).

 See also Clark, 198 U. S., at 367-368; Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 531 (1906) (“In the opinion of the legislature and the Supreme Court of Utah the public welfare of that State demands that aerial lines between the mines upon its mountain sides and railways in the valleys below should not be made impossible by the refusal of a private owner to sell the right to cross his land. The Constitution of the United States does not require us to say that they are wrong”); O’Neill v. Learner, 239 U. S. 244, 253 (1915) (“States may take account of their special exigencies, and when the extent of their arid or wet lands is such that a plan for irrigation or reclamation according to districts may fairly be regarded as one which promotes the public interest, there is nothing in the Federal Constitution which denies to them the right to formulate this policy or to exercise the power of eminent domain in carrying it into effect. With the local situation the state court is peculiarly familiar and its judgment is entitled to the highest respect”).

 Cf. Village of Euclid v. Ambler Realty Co., 272 U. S. 365 (1926).

 It is a misreading of Berman to suggest that the only public use upheld in that case was the initial removal of blight. See Keply Brief for Petitioners 8. The public use described in Berman extended beyond that to encompass the purpose of developing that area to create conditions that would prevent a reversion to blight in the future. See 348 U. S., at 84-35 (“It was not enough, [the experts] believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums.... The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes, but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the *485 cycle of decay of the area could be controlled and the birth of future slums prevented”). Had the public use in Berman been defined more narrowly, it would have been difficult to justify the taking of the plaintiff’s non-blighted department store.

 Any number of cases illustrate that the achievement of a public good often coincides with the immediate benefiting of private parties. See, e. g., National Railroad Passenger Corporation v. Boston & Maine Corp., 503 U. S. 407, 422 (1992) (public purpose of “facilitating Amtrak’s rail service” served by taking rail track from one private company and transferring it to another private company); Brown v. Legal Foundation of Wash., 538 U. S. 216 (2003) (provision of legal services to the poor is a valid public *486 purpose). It is worth noting that in Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984), Monsanto, and Boston & Maine Cory., the property in question retained the same use even after the change of ownership.

 Notably, as in the instant case, the private developers in Berman were required by contract to use the property to carry out the redevelopment plan. See 348 U. S., at 30.

 Nor do our eases support Justice O’Connor’s novel theory that the government may only take property and transfer it to private parties when the initial taking eliminates some “harmful property use.” Post, at 501 (dissenting opinion). There was nothing “harmful” about the non-blighted department store at issue in Berman, 348 U. S. 26; see also n. 13, supra; nothing “harmful” about the lands at issue in the mining and agriculture cases, see, e. g., Strickley, 200 U. S. 527; see also nn. 9, 11, supra; and certainly nothing “harmful” about the trade secrets owned by the pesticide manufacturers in Monsanto, 467 U. S. 986. In each case, the public purpose we upheld depended on a private party’s future use of the concededly nonharmful property that was taken. By focusing on a property’s future use, as opposed to its past use, our cases are faithful to the text of the Takings Clause. See U. S. Const., Arndt. 5 (“[N]or shall private property be taken for public use, without just compensation”). Justice O’Connor’s intimation that a “public purpose” may not be achieved by the action of private parties, see post, at 500-501, confuses the purpose of a taking with its mechanics, a mistake we warned of in Midkiff, 467 U. S., at 244. See also Berman, 348 U. S., at 33-34 (“The public end may be as well or better served through an agency of private enterprise than through a department of government”).

 Courts have viewed such aberrations with a skeptical eye. See, e. g., 99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123 (CD Cal.2001); cf. Cincinnati v. Vester, 281 U. S. 439, 448 (1930) (taking invalid under state eminent domain statute for lack of a reasoned explanation). These types of takings may also implicate other constitutional guarantees. See Village of Willowbrook v. Olech, 528 U. S. 562 (2000) (per curiam).

 Cf. Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting) (“The power to tax is not the power to destroy while this Court sits”).

 A parade of horribles is especially unpersuasive in this context, since the Takings Clause largely “operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge.” Eastern Enterprises v. Apfel, 524 U. S. 498, 545 (1998) (Kennedy, J., concurring in judgment and dissenting in part). Speaking of the takings power, Justice Iredell observed that “[fit is not sufficient to urge, that the power may be abused, for, such is the nature of all power, — such is the tendency of every human institution: and, it might as fairly be said, that the power of taxation, which is only circumscribed by the discretion of the Body, in which it is vested, ought not to be granted, because the Legislature, disregarding its true objects, might, for visionary and useless projects, impose a tax to the amount of nineteen shillings in the pound. We must be content to limit power where we can, and where we cannot, consistently with its use, we must be content to repose a salutory confidence.” Calder, 3 Dall., at 400 (opinion concurring in result).

 See also Boston & Maine Corp., 503 U. S., at 422-423 (“[W]e need not make a specific factual determination whether the condemnation will accomplish its objectives”); Monsanto, 467 U. S., at 1015, n. 18 (“Monsanto argues that EPA and, by implication, Congress, misapprehended the true ‘barriers to entry’ in the pesticide industry and that the challenged provisions of the law create, rather than reduce, barriers to entry. . . . Such economic arguments are better directed to Congress. The proper inquiry before this Court is not whether the provisions in fact will accomplish their stated objectives. Our review is limited to determining that the purpose is legitimate and that Congress rationally could have believed that the provisions would promote that objective”).

 The amici raise questions about the fairness of the measure of just compensation. See, e. g., Brief for American Planning Association et al. as Amici Curiae 26-30. While important, these questions are not before us in this litigation.

 See, e. g., County of Wayne v. Hathcock, 471 Mich. 445, 684 N. W. 2d 765 (2004).

 Under California law, for instance, a city may only take land for economic development purposes in blighted areas. Cal. Health & Safety Code Ann. §§ 33030-33037 (West 1999). See, e. g., Redevelopment Agency of Chula Vista v. Rodos Bros., 95 Cal. App. 4th 309, 115 Cal. Rptr. 2d 234 (2002).

 For example, some argue that the need for eminent domain has been greatly exaggerated because private developers can use numerous techniques, including secret negotiations or precommitment strategies, to overcome holdout problems and assemble lands for genuinely profitable *490 projects. See Brief for Jane Jacobs as Amicus Curiae 13-15; see also Brief for John Norquist as Amicus Curiae. Others argue to the contrary, urging that the need for eminent domain is especially great with regard to older, small cities like New London, where centuries of development have created an extreme overdivision of land and thus a real market impediment to land assembly. See Brief for Connecticut Conference of Municipalities et al. as Amici Curiae 13, 21; see also Brief for National League of Cities et al. as Amici Curiae.