# IN THE SUPREME COURT OF TEXAS

════════════
No. 10-0316
════════════

CITY OF AUSTIN, PETITIONER,

v.

HARRY M. WHITTINGTON, ET AL., RESPONDENTS

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

JUSTICE HECHT, joined by JUSTICE WILLETT, concurring in part and dissenting in part.

The Court states, and the parties agree, that "[a] taking may not be used to confer a private benefit on a particular private party or parties through the use of the property."[1] The City of Austin contracted with a private developer, H. L. Hotels, LLC, to build a hotel with an underground parking lot near the convention center, but soon afterward decided to relieve the developer of its obligation to construct the parking lot. Instead, the City condemned the Whittingtons' nearby property for the parking lot, reducing the cost of the hotel project by some $10-12 million. The Whittingtons argue that the reduction benefitted the developer, and therefore the taking was invalid.

The premises underlying the Whittingtons' argument are not in question. The Court states that:

───────────────────────

[1] *Ante* at ___ (quoting a jury instruction to which the parties agreed).

- a condemnor's "fraud, bad faith, and arbitrariness and capriciousness . . . may invalidate takings";[2]

- "fraud [means] 'the taking of property for private use under the guise of public use, even though there may be no fraudulent intent on the part of the condemnor'";[3]

- "this inquiry is an affirmative defense and the landowner bears the burden of proving his allegations";[4]

- "[t]he trial court should only submit the issue to a jury if the underlying facts are in dispute";[5]

- "the jury found that . . . the decision to take the [Whittingtons'] property was fraudulent, in bad faith, and arbitrary and capricious";[6]

- "the City and the Whittingtons do not [now] dispute the underlying facts on these issues; rather, they dispute the legal effect of those facts (*e.g.*, whether those facts amount to fraud, bad faith, or arbitrariness and capriciousness)";[7]

- thus, "[t]he inquiry . . . is a question of law for the court".[8]

Two issues remain: did the reduction in the cost of the hotel project benefit the developer, and if so, did that benefit invalidate the taking.

The first issue is conceded by the City. As the Court notes, "[t]he Whittingtons state in their briefing that H. L. Hotels benefitted from the [City's] decision to not build the . . . underground

---

[2] *Ante* at ___.

[3] *Ante* at ___ (quoting a jury instruction to which the parties agreed).

[4] *Ante* at ___ (citation omitted).

[5] Ante at ___.

[6] *Ante* at ___.

[7] *Ante* at ___.

[8] *Ante* at ___.

2

garage" as part of the hotel project.[9] In its Brief, the City explains: "H.L. Hotels asked to be relieved of its obligation to provide the parking spaces for convention center usage. The City acquiesced and, as one of the consequences, the hotel project had a cost savings of around $10 million."[10] This benefitted the developer and the City knew it. As the City states in its Reply Brief, the "evidence shows . . . that the City knew the hotel developer would financially benefit from the City's choice to condemn [the Whittingtons' property] instead of forcing the building of the parking facility as part of the hotel garage facility."[11] This was no careless statement. At oral argument, much of counsel's attention was directed to whether the developer benefitted from the City's decision to excuse it from building the parking lot. The Whittingtons' counsel emphasized that "the result was $10 or $12 million benefit to the developer, no benefit to the City." In response, the City's counsel conceded that "there clearly was a benefit to the developer of the hotel" when the City "let [it] off the hook for $10 million in investment" but argued that "there was a benefit to the City, too" because it did not get a parking garage with the problems the developer projected.

Unwilling to take the City at its word, the Court attempts to make a better case for the City than the City can make for itself. The Court seems to fault the Whittingtons for "not call[ing] the project developer or an expert to testify as to any alleged benefit the developer might have

---

[9] *Ante* at ___ n.2.

[10] Petitioner's Brief on the Merits 3-4 (citation omitted).

[11] Petitioner's Reply Brief 20.

3

received."[12]  But the evidence of benefit came from the City's own witness.[13]  At one point in its opinion, the Court states that the record establishes that the reduction in the project cost from omitting the underground garage was a benefit to the City and actually hurt the developer by reducing its fee.[14]  But the Court ignores the City's own evidence that the developer received bonds in lieu of a fee, in the same amount after it was relieved of the obligation to build the parking lot as before.[15]  Later, the Court retreats to the position that "[t]he effect of the City's decision to take [the Whittingtons' property] rather than build the larger underground garage with the hotel project was,

---

[12] *Ante* at ___ n.2.

[13] The City's convention center director testified as follows:

"Q.     How much reduction in cost was it to get rid of that parking requirement?

"A.     I believe it was in the 10, $12 million range.

"Q.     So 10 or $12 million that that no longer had to be in this construction project because the Whittington block was going to be used instead.

"A.     I think a 10 or $12 million reduction would be — was the cause of the necessity for the investors to get them to invest, and the parking was the means by which that was accomplished for the reduction."

[14] *Ante* at ___ n.2 ("The only evidence of any impact on the developer was that the project cost was reduced by $10-12 million, which would have resulted in a lesser fee to the developer of at least $450,000 in light of its 4.5% fee.").

[15] The City's convention center director testified as follows:

"Q.     How much did [the developer] make out of this project in fees?

"A.     I'm not sure exactly how much they made at the end.  There was — they took — in lieu of fees, they took some third-tier bonds.

                              *       *       *

"Q.     . . . [D]id you say that they got $10 million worth of bonds for their development fees?

"A.     That was — yeah, that was in lieu of fees.  They got the third-tier bonds."

4

at best, an incidental benefit to the H.L. Hotels."[16]  But the City's own evidence is that the value of the reduction in the developer's construction obligation was $10-12 million, and there was no corresponding reduction in the remuneration to the developer.

The Court's evidentiary inventions, even if the City would adopt them, and even if the record would support them, neither of which is true, are contradicted by the jury's verdict.  Even if there were evidence in the record that the City has not found or will not cite to bolster its own position, and there is not, the jury was free to disbelieve that evidence and find from the evidence cited, as they did, that the City's taking of the Whittingtons' property was a guise to benefit the developer. The Court's conclusion contradicts the record, the verdict, the judgment, the affirmance, the briefs, and the arguments.  It simply cannot be disputed that the condemnation of the Whittingtons' property was a significant benefit to the developer.  While it may be difficult to assign a precise dollar value to that benefit, the City acknowledges that had the developer not been relieved of its obligation to build underground parking, the project could not have been financed.[17]

The second issue, the one the City actually argues rather than concedes, and the Court ignores, is whether the benefit to the developer invalidates the taking.  This issue is much more difficult.  It is useful to think of possible circumstances along a continuum from one extreme to another.  Had the City condemned the Whittingtons' property and simply deeded it over to a private developer for use in a commercial project, the condemnation would very likely be invalid.  Apart

---

[16] *Ante* at ___.

[17] The City's convention center director testified: "Either we had to increase the revenue that the investors would believe, and the feasibility company was not willing to increase the revenue numbers, their projections.  And so, the only other alternative was to reduce the expense side to increase our debt service coverage."

from the statutory prohibition against "the use of eminent domain . . . for economic development purposes",[18] it would be difficult to argue that such a taking had a public purpose.[19] On the other end of the spectrum, had the City planned from the beginning to meet the convention center's parking needs by taking the Whittingtons' property, wholly apart from whether it could also encourage construction of the hotel project, it would be difficult to argue that a taking for public parking lacked a public purpose. The present case lies between these two clearer situations.

The parties have not been entirely clear in describing the effect of the abandonment of the underground parking component of the hotel project. It appears that after the City accepted the developer's proposal over competing offers, and the two reached agreement, a concern arose that investors might not buy the bonds used to finance the project unless either the revenue projections were increased or the construction costs were decreased. The City concluded that the latter course was its only alternative, and that the only means of achieving it was to relieve the developer of its parking construction obligation. In essence, the City agreed to accept less than it had bargained for. This was clearly a benefit to the developer and a detriment to the City, but the change may have been necessary to salvage the project. Merely renegotiating the deal and seeking parking elsewhere is not, in my view, a taking. But the City began to explore acquisition of the Whittingtons' property only nine days after accepting the developer's proposal, which provided for parking as part of the hotel project. Nothing in the record explains why the parking component of the developer's proposal

---

[18] TEX. GOV'T CODE § 2206.001(b)(3). The parties dispute whether this statute, enacted in 2005 after the events in this case, applies retroactively.

[19] *But see generally Kelo v. City of New London*, 545 U.S. 469 (2005).

became problematic in so short a time. Rather, a fair inference — indeed, a strong one — is that financing problems were apparent before the proposal was accepted, and that going forward would require a contribution to the project, which the City found by condemning the Whittingtons' property. From the evidence, one could conclude as the jury did, that the City condemned the Whittingtons' property to "sweeten the deal" for the private interests involved — that, in the language of the jury charge, the taking was "for private use [to benefit the developer] under the guise of public use [for public parking], even though there may [have been] no fraudulent intent on the part of the condemnor", the City. The City agrees, and the Court holds, that if this conclusion were true, as found by the jury, the taking would be invalid.

I do not suggest that the legitimacy of this taking depends on the subjective intent of the individual actors. Whether the taking was fraudulent or in bad faith, as defined in the agreed jury instructions and approved by the Court, should be an objective inquiry. But it is important to realize that the viability of a project of the magnitude of the one in this case depends on many factors. While the City might have condemned the Whittingtons' property for public parking independently of its hopes for a hotel project, it did not do so, and perhaps, could not have done so. Nothing in the record before us suggests that the City ever had any such intent. In these circumstances, the evidence supports the jury's verdict, and their finding is, as a legal matter, a defense to the taking.

I am fully mindful that the power of eminent domain is broad, that the public-use requirement is a limited restriction on that power, and that the judiciary must necessarily give deference to the more political departments' determinations of what is public use. But because the power of eminent domain is broad and the right of property ownership is fundamental, the power must be exercised

7

with complete rectitude; though public use is a narrow restriction of the power of eminent domain, it cannot be construed so broadly as to effect no restraint at all; and judicial deference does not require abdication of responsibility.

I agree with the Court generally on the other issues addressed. But from its conclusion that the City's taking of the Whittingtons' property for parking was valid, I respectfully dissent.

_____
Nathan L. Hecht
Justice

Opinion delivered: August 31, 2012