GREMILLON, Judge,
dissents.
Ill dissent from the opinion of the majority and would find that the Cooperative Endeavor Agreement/Payment in Lieu of Taxes (CEA/PILOT) was validly and lawfully confected between the various gov *680 erning authorities and Cameron LNG, LLC (LNG).
It is presumed that the Legislature acts within its constitutional authority in passing a statute; therefore, courts are required to “construe a statute so as to preserve its constitutionality when it is reasonable to do so.” City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund, 05-2548, p. 12 (La. 10/1/07), 986 So.2d 1, 12. 1978 La.Acts No. 617 enacted the “Louisiana Economic Development Law,” La.R.S. 33:9020, et seq. Louisiana Revised Statutes 33:9031 authorizes any local governmental subdivision to enter into a cooperative endeavor with a private corporation. Even more specific to the issue at hand, though, is La.R.S. 33:2758. The majority agrees with me and the Louisiana Attorney General that this statute is constitutional. It allows the Cameron Parish governing authority—that is to say, the Cameron Parish Police Jury— to collect ad valorem taxes pursuant to a CEA/PILOT. Section 2758 says nothing about assessment of |2the taxes, just the collection of them. Further, basing ad valo-rem taxes upon the terms of a CEA/PILOT does not exempt the taxpayer from ad valorem taxes; it merely provides a different method of them calculation.
In what can only be described as a strange way to prove than an agreement is invalid, the majority cites what it admits are “multiple examples” of similar agreements that our courts have found to be valid. It then gamely attempts to distinguish those agreements, first, by declaring that the instant agreement “does not involve a joint public-private undertaking.” I respectfully disagree. The mind struggles to conceive of a something that is more of a joint public-private undertaking than this one which involves the school board, the police jury, and the sheriff on the public side and a massive business enterprise producing thousands of jobs on the private side.
Those other unquestionably-valid agreements are different, says the majority, because they “usually” involve an arrangement wherein the private business leases property from a public entity to form the foundation upon which the PILOT is based. First, I would suggest that what “usually” happens is not a solid legal argument. It is certainly insufficient as a basis for overriding the political will of the people as expressed by the police jury and the school board. Second, the statute authorizing this PILOT (a statute the majority and the attorney general both conclude is valid and constitutional) does not limit these agreements to situations involving private leasing of public property in any way. That restriction simply does not exist.
The Louisiana Constitution addresses ad valorem taxes in exhausting detail. Article VII, § 18, governs the assessment of ad valorem taxes. It provides that “[pjroperty subject to ad valorem taxation shall be listed on the assessment rolls at its assessed valuation,” which shall be a percentage of its fair market value (FMV), Land that percentage - shall be uniform throughout the state on the same classes of property. Article VII, § 21, opens, “In addition to the homestead exemption provided for in Section 20 of this Article, the following property and no other shall be exempt from ad valorem taxation.... ” (Emphasis added). Article VII, § 21(F) authorizes exemptions from ad valorem taxes by agreement with the State Board of Commerce and Industry and only for a period of ten years.[1] This section itself *681 belies the majority’s conclusion that, “Under our state constitution, uniformity has always been paramount.” See 212 So.3d at 672. The State has the clear authority to exempt some taxpayers from ad valorem taxes. Section 21(F), though, merely addresses the granting of an exemption from ad valorem taxes, and the CEA/PILOT did not grant an exemption. Article VII, § 21(F) does not apply to this case.
“The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value.” Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 526-27, 79 S.Ct. 437, 440-41, 3 L.Ed.2d 480 (1959).
The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination. Harper v. Virginia Board of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 [ (1966) ]. Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation. As stated in Allied Stores of Ohio v. Bowers, 358 U.S. 522, 526-527, 79 S.Ct. 437, 440-441, 3 L.Ed.2d 480:
|/The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value.’
Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973) (Footnote omitted) (Emphasis added). Whether such classifications are properly established requires that a court determine whether the law is reasonably designed to further a state policy. Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).
In enacting the Cooperative Economic Development Law, the Legislature enacted specific findings and declared that:
(1) There exists in some of the regions, parishes, and municipalities of the state a condition of substantial and persistent unemployment, underemployment, and other forms of economic distress.
(2) Such unemployment, underemployment, and other forms of economic distress cause hardships to many individual *682 citizens of the state and their families, waste invaluable human resources, and adversely affects the welfare and prosperity of the people.
(3) The maintenance of the economy of the several local governmental subdivisions of the state at a high level is necessary to overcome these problems and is vital to the best interest of the state.
(4) The maintenance of the economy of the several local governmental subdivisions of the state at a high level is a matter of public policy and the cooperative economic development activities |5and powers prescribed and conferred by this Chapter are for a public purpose for which public money may be expended.
(5) As the maintenance of the economies of said local political subdivisions at a high level is found and declared to be a public purpose, the state’s assistance to areas and regions of substantial and persistent unemployment, underemployment, and other forms of economic distress is necessary for the employment of effective steps in the planning, promotion, and financing of local economic development.
(6) State authorization to local governmental subdivisions, public corporations, and public benefit corporations to engage in cooperative endeavors with each other, the United States or its agencies, or with any public or private associations, corporations, or individuals for the purpose of economic development would help said local governmental subdivisions to alleviate the conditions of unemployment, underemployment, and other forms of economic distress presently existing in their areas, and as such, is in the public interest.
(7) Economic development is a legitimate concern of government because it serves the public interest, but it is not purely and solely a public purpose, since successful economic development serves the private interests of business and industry as much as the public interest.
(8) Public-private partnerships which take advantage of the special expertise and experience of representatives of the private sector can be among the most effective programs to encourage and maintain economic development.
(9) The economic development needs of the state of Louisiana require the existence of entities which can function as public-private partnerships, taking advantage of the congruence between the public interest and the interest of business and industry.
(10) It is in the best interest of the state of Louisiana and of its regions, parishes, and municipalities to encourage, create, and support public-private partnerships and to permit and encourage participation by representatives of private-sector industries which may benefit from economic development programs, while providing appropriate protections for the public interest.
La. R.S. 33:9021. Courts give considerable deference to a legislature’s determination of what constitutes a public purpose. Kelo v. City of New London, Conn., 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). The question, then, is whether the CEA/PILOT is reasonably tailored to further the legitimate public interests of the | ^citizens of Cameron Parish. This agreement is clearly tailored to further a legitimate public purpose as expressed in the Cooperative Economic Development Law, La.R.S. 33:9021 and La.R.S. 33:2758.
As things stand under the majority’s ruling, LNG will owe no ad valorem taxes until possibly as late as 2026. Under the CEA/PILOT, LNG will pay as much as $209.5 million in payment in lieu of taxes *683 during that same period, and can pay no less than $45,523,815.10. And Cameron Parish, in exchange for reduced ad valo-rem tax receipts, will enjoy an investment in permanent facilities for natural gas liquefaction and export that will cost over $9 billion to construct and will employ 3,692 additional residents.[2] The majority notes that the defendants argue that the parish will receive many times what will be recovered under the CEA/PILOT were LNG’s property to be assessed at full FMV. I note, though, that there is absolutely no evidence in the record that this assertion is correct. I would further note that the only way this prediction by defendants can be fulfilled is if they were to prevail in a pending class-action lawsuit in the Nineteenth Judicial District Court in which they are contesting the validity of the contract between LNG and the State Board of Commerce and Industry. And in any event, this consideration represents a usurpation by the majority of the police jury’s constitutional authority to determine what is in its constituents’ best interests. La. Const, art. VI, § 7.
I also take strong issue with the majority’s opinion that the CEA/PILOT poses “serious ramifications for assessors who do not follow the procedures” for assessing and collecting ad valorem taxes. See 212 So.3d at 670. The majority cites La.R.S. 47:2957(B) for the proposition that the CEA/PILOT places 17the assessor in jeopardy of being liable for the taxes LNG might otherwise owe. Louisiana Revised Statutes 47:1957 only places an assessor at risk when he omits “taxable property’ from the assessment list. The law as it exists grants a wide array of exemptions from ad valorem taxes. See La. Const. Art. VII, §§ 19-21. So assessors are accustomed to making the proper determination of what is taxable and what is not; indeed, that is a core function of his position. Furthermore, the agreement between the State Board of Commerce and Industry and LNG provides, at Article IX, that LNG shall provide an annual report to the assessor on a form prepared by the assessor so that the property can be listed in the assessment rolls; therefore, provision has already been made for the Cameron Parish Assessor’s function of listing LNG’s property in the rolls.
The same reasoning protects the sheriff from any possible difficulties. Under La. R.S. 33:2758, the sheriff has “lawful authority” to collect a payment in lieu of taxes from LNG. To suggest otherwise is to ignore the plain language of the statute.
The Cameron Parish Police Jury, in my opinion, has confected an agreement with LNG that does further a legitimate public purpose, and I would reverse the trial court.

. Such a contract is in the record, at Tr. II, p. 202, which exempts LNG from all ad valorem taxes until 2018 with an additional five years renewal upon LNG’s application, signed by *681 Governor Bobby Jindal. There is a second such contract at Tr. II, p. 308 which grants an exemption through 2021, again with a five-year renewal through 2026, signed by Governor John Bel Edwards.

. The record shows that, of the over $9 billion invested in the facility, $4.42 billion will be spent directly on labor and engineering services.