# Supreme Court of Texas

No. 20-0393

James Fredrick Miles,

*Petitioner*,

v.

Texas Central Railroad Infrastructure, Inc. and
Integrated Texas Logistics, Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

JUSTICE DEVINE, dissenting.

The moment the idea is admitted into society that property is not as sacred as the laws of God, and that there is not a force of law and public justice to protect it, anarchy and tyranny commence.[1]

– John Adams

---

[1] John Adams, *Marchmont Nedham: The Right Constitution of a Commonwealth, Examined*, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA (1790), *in* 6 THE WORKS OF JOHN ADAMS 9 (Boston, Bolles & Houghton 1851).

This Court has long recognized that strong judicial protection of individual property rights is essential to freedom itself.[2] Texas has traditionally followed the lead of federal courts regarding eminent-domain authority. In *Kelo v. City of New London*, the United States Supreme Court upheld a city's taking of private property through eminent domain only to turn it over to private parties for economic development.[3] But *Kelo* sparked a revolution in Texas exemplified by judicial and legislative decisions that strove to ensure that constitutionally granted property rights are protected.

One such change came in 2009 when, in response to *Kelo*, Texans amended the Texas Constitution to rein in the activist judiciary's expansion of eminent-domain powers. Today, the Court ignores Article I, Section 17 of the Texas Constitution and hammers another nail in the coffin of private property rights. Texas's Takings Clause could not be clearer regarding limits on the concept of "public use." It provides, in pertinent part:

(a) No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person, and only if the taking, damage, or destruction is for:

(1) the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by:

---

[2] *See Severance v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012) (stating that private property rights are "fundamental, natural, inherent, inalienable, not derived from the legislature" (quoting *Eggemeyer v. Eggemeyer*, 544 S.W.2d 137, 140 (Tex. 1977))).

[3] 545 U.S. 469, 473, 475 (2005).

2

> (A) the State, a political subdivision of the State, or the public at large; or
>
> (B) an entity granted the power of eminent domain under law; or
>
> (2) the elimination of urban blight on a particular parcel of property.
>
> (b) In this section, "public use" does not include the taking of property under Subsection (a) of this section for transfer to a private entity *for the primary purpose of economic development or enhancement of tax revenues.*[4]

This Court has not addressed Section 17(b) since its amendment in 2019. However, in *KMS Retail Rowlett, LP v. City of Rowlett*, the Court responded to the dissent by acknowledging that it would welcome the opportunity to explore Section 17(b)'s impact on public-use jurisprudence.[5] Although this case presents such an opportunity, the Court squanders it.[6]

The Court "decline[s] to raise and decide an issue that Miles has not presented or argued."[7] "[T]he refusal to consider arguments not

---

[4] TEX. CONST. art. I, § 17(a)-(b) (emphasis added).

[5] 593 S.W.3d 175, 194 (Tex. 2019) ("And we readily agree that constitutional text—especially when it has been amended since this Court developed its public-use jurisprudence—should rule over judge-invented interpretive rules."); *see ETC Mktg., Ltd. v. Harris Cnty. Appraisal Dist.*, 528 S.W.3d 70, 89 (Tex. 2017) (Brown, J., concurring) ("The text of the [Texas] Constitution, interpreted in light of its original meaning, should prevail over slavish devotion to judge-made, form-over-substance, multi-factor tests.").

[6] As Miles explains, "That is why the citizens of Texas have enshrined in their Constitution the requirement that 'private entit[ies]' can exert eminent domain authority only for 'public use,' and under conditions authorized 'under law.'"

[7] *Ante* at 27 n.17.

raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary."[8]  This is such a time.  There are few things of more importance than Texans' private property rights.  The Court fails to consider that Texas Central itself recognizes that the primary purpose of building the proposed high-speed train is for economic development or enhancement of tax revenues in direct violation of the Texas Constitution's Takings Clause.[9]  In fact, Texas Central's very first argument in opposition to Miles's motion for rehearing is titled: "The high-speed train will bring great economic benefits to Texas."  In that subsection, Texas Central highlights the constitutional violation in arguing that:

- "Construction and long-term operation of the high-speed train will create thousands of jobs for Texas" and will "add 317,207 'job years' to Texas's economy."

- "The [Federal Railroad Administration] also found that the high-speed train will 'create [] employment opportunities [for] minority and/or low-income populations.'"

- "Rural communities will enjoy economic benefits . . . . Over 10% of the permanent jobs created by the high-speed train will be located between Dallas and Houston."

- "[T]he high-speed train will bring additional tax revenue to Texas.  Such revenue will benefit schools, libraries, parks, hospitals, etc."

---

[8] *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring).

[9] *See* TEX. CONST. art. I, § 17(b).

4

Texas Central repeats the above arguments in its brief. Additionally, a subsection of its Statement of Facts is titled: "The high-speed train will bring great economic benefits to Texas." In that subsection, Texas Central states: "Increasing public mobility will expand job opportunities by allowing easy commutes, *e.g.*, between Dallas and Houston, Grimes County and Dallas etc. . . . . And every permanent job created by the high-speed train is projected to 'indirectly spur two to four jobs in supporting industries.'"

Texas Central's description of the project demonstrates that the proposed use will bring about the evils Section 17(b) is designed to avoid—a repetition of *Kelo*.[10] As Justice Thomas warned in his *Kelo* dissent, "If . . . 'economic development' takings are for a 'public use,' any taking is[.]"[11] Similarly, Justice O'Connor cautioned:

> Under the banner of economic development, all private property is now vulnerable to being taken and transferred to another private owner, so long as it might be upgraded— *i.e.*, given to an owner who will use it in a way that the legislature deems more beneficial to the public—in the process. To reason, as the Court does, that the incidental public benefits resulting from the subsequent ordinary use of private property render economic development takings "for public use" is to wash out any distinction between private and public use of property.[12]

After *Kelo*, Texas stood as a bastion for private property rights, with our Constitution purposefully strengthened to protect these

---

[10] *Cf. Kelo*, 545 U.S. at 473-75.

[11] *Id.* at 506 (Thomas, J., dissenting).

[12] *Id.* at 494 (O'Connor, J., dissenting).

5

essential rights. The Court's holding today flies in the face of that history and proud legacy of safeguarding the sacred right of land ownership. Here, according to the Court, property ownership is now determined not by actual legal ownership but by which person or business is more likely to use the property in economically beneficial ways. The Court incentivizes private businesses—even foreign ones—to exercise eminent-domain authority over Texas landowners. But giving such power directly to a private entity is not what our forefathers intended in drafting the Texas Constitution. Nor is it what Texans intended in amending the Constitution in 2009.

On this occasion, the Court fails to give due weight to crucial considerations that guide our interpretation and application of the Texas Constitution: (1) Texas voters amended our Takings Clause for the purpose of protecting Texas property owners from seizures such as this; (2) a statute cannot change the Texas Constitution's meaning; and (3) our Constitution requires strict construction in favor of the landowner.[13] Texas courts implement these considerations regularly in actions involving grants of eminent-domain power.[14] Applying Article I, Section 17's plain and unambiguous language, Texas Central is not

---

[13] *See Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012) (stating that "[t]he legislative grant of eminent-domain power is strictly construed" and in "strict compliance" with the Texas Constitution); *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 831 (Tex. 1958) (explaining that the scope of power is to be "strictly construed in favor of the landowner and against those corporations and arms of the State vested therewith").

[14] *See Tex. Rice*, 363 S.W.3d at 198; *Crawford Fam. Farm P'ship v. TransCanada Keystone Pipeline, L.P.*, 409 S.W.3d 908, 914-15 (Tex. App.—Texarkana 2013, pet. denied).

entitled to exercise eminent-domain power because the requirement of a "public use" is not met.

This Court is a judicial body whose function is to interpret, defend, and apply the laws of Texas, not to create laws by judicial fiat nor to uphold legislative enactments that operate contrary to our charter. For this reason, and because the Court's opinion advances a devastating erosion of Texas landowners' property rights, I respectfully dissent.

 

John P. Devine
Justice

**OPINION FILED:** June 24, 2022