PAUL A. BONIN, Judge.
_JjWesley Taylor, the Chief of Environmental Health for the City of New Orleans, adjudicated the property which is the subject of this expropriation proceeding “blighted” on February 27, 2002.[1] Based upon that adjudication, the New Orleans Redevelopment Authority (NORA) instituted these expropriation proceedings in 2005 against the owners of record, Kit-toria Johnson, wife of/and Joseph Burgess, Jr. Keith Doley, the attorney appointed by the court to represent the absentee, Joseph Burgess, Jr., filed an exception contending that the expropriation of this property violated express prohibitions of the Louisiana Constitution. The district court, after a trial on the merits, overruled the exception and authorized the expropriation of the property. For the reasons which follow, we affirm.
I
The subject property, Municipal No. 2034-36-38½ Clouet Street, is a single property consisting of two narrow lots, approximately 62 feet wide by 102 feet deep, located in the Ninth Ward of New Orleans.[2] The property was in a *572 | ¿residential neighborhood consisting of typically frame double dwellings, raised on piers, or on cement slab foundations. Mr. and Mrs. Burgess had neglected and ultimately abandoned them house on that property. Complaints against the property began in 1991. Grass and weeds grew unmown, and overgrew the sidewalk; debris harbored and invited rats and other pests; an abandoned automobile cluttered the property. While the vacant house was standing (until its demolition by the City) it attracted such illegal activities as drug use, vagrancy, and vandalism.
The City’s Office of Environmental Health handled complaints including those generated by a city council member and the Office of Public Advocacy, arising from reports of a robbery on the property in 1995, and from numerous reports of rat harborage. Since 1996, the Burgesses failed to pay them property taxes. Liens for failure to pay federal income tax, and a lien by a private creditor were filed against the property. Despite a continuing history of notices from the city, fines assessed by the city after its agencies responded to complaints about the property, and bills for the city’s periodic mowing of the weeds in order to control the hazards to public health and safety, the Burgesses did nothing to eradicate the problems afflicting them property. Repeatedly, inspectors observed high grass and rampant weeds, garbage cluttering the lot and sidewalks, a dilapidated vacant building, an abandoned automobile, and reports of crimes at the site.
The house on the Clouet Street property was so dilapidated and hazardous that the City obtained a demolition permit, and the structure was demolished on March 20, 1997, leaving a cement slab amid the weeds and debris.[3]
| ..¡Ultimately, as the stack of complaints, inspections, returned notices and letters, and issuance of fines and liens grew higher, the City scheduled an administrative hearing pursuant to La. R.S. 13:2575 and 2576[4] to adjudicate the property to the city.
Before their unexplained abandonment of the property, Mr. and Mrs. Burgess had raised their son, Joseph Burgess III, in the house. They divorced in 1990. Joseph Burgess, Jr., died in 2001. Ms. Burgess did not attempt a community property partition during her husband’s lifetime nor did she take any steps to open his succession as a co-owner in indivisión with the decedent.[5] Indeed, no proceedings were filed to open his succession by any interested person.
According to Chief Taylor, the proceedings for enforcement of the blight adjudication began on November 13, 2001, and concluded with a hearing on February 27, 2002. No one representing the Bur- *573 gesses appeared. The hearing officer issued a ruling, and pursuant to La. R.S. 13:2575(F) sent notice to the Burgesses as the propei’ty owners of record. No one on behalf of Joseph Burgess, Jr. or Kittoria Johnson Burgess appealed the adjudication of blight as provided by La. R.S. 13:2575 and 2576 whereby a property owner can appeal the hearing officer’s adjudication within thirty days of the decision by filing a petition in Civil District Court for the Parish of Orleans pursuant to La. R.S. 49:964. If that person is aggrieved by a decision or order in an adjudication proceeding, he or she is entitled to judicial review, whether or not he or she has applied to the agency for rehearing. See Rabb v. State Bd. of Certified Public Accountants of La., 04-0586, p. 2 (La.App. 4 Cir. 12/22/04), 893 So.2d 904, 906-07; Joseph C. Canizaro-901 Ltd. Partnership v. State of Louisiana, Dept. of Public Safety, Office of State Fire Marshal, 570 So.2d 56, 61 (La.App. 4th Cir.1990); Granger v. Garrett, 445 So.2d 18, 19-20 (La.App. 4th Cir.1983) (stating that the standard of review is set forth in Hanson v. Louisiana State Racing Comm’n, 436 So.2d 1308, 1309 (La.App.1983), writ denied, 443 So.2d 592 (La.1983), which holds that the scope of review is for abuse of discretion or arbitrary finding on the record).
On July 21, 2005, counsel for NORA wrote to Mr. and Mrs. Burgess by certified mail advising that their property was adjudicated “blighted” and offering three options: that the Burgesses rehabilitate the property to meet all code requirements; that they give the property to NORA as a donation; or that NORA would transfer the property to “new owners” to complete rehabilitation. The certified letter was returned to the City.
II
On April 4, 2007, as authorized by La. R.S. 19:136, et seq. and La. R.S. 33:4720.59, NORA filed a petition in the district court seeking the expropriation of the Clouet Street property, cancellation of liens on the property, notice to the property owners, and a “revisit” on the issue of blight, all in compliance with statutory requirements; and it deposited the “fair market value,” as determined by two appraisers, in the court registry to be paid to the property owners after all fees and costs were deducted by the court. The petition did not seek transfer of the property to any third party.
At the time of the filing of the petition, the total amount of taxes, together with delinquent health violation liens, penalties, and interest was $37,294.60. Two | .^appraisers agreed that the fair market value of the property at the filing of the petition was $10,000 less the $1,500 cost of demolition of the concrete slab, for a fair market value of $8,500. Additional fees and costs of the trial (curator’s fee, court costs, etc.) still remain to be deducted from the balance in the registry of the court.
Service of citation and petition was effected on Ms. Burgess on April 19, 2007. She did not answer the lawsuit. Although she was a co-owner in indivisión of the property, she failed to file responsive pleadings within fifteen (15) days as required pursuant to La. C.C.P. art. 1001, and La. R.S. 19:6 and 19:7, thus relinquishing her legal rights to appeal any expropriation of the property. The district court entered an order on May 8, 2008, granting the motion in limine filed by NORA, ruling that Ms. Burgess’ failure to file an answer within fifteen days of service of the petition “constitutes a waiver of all defenses to the suit except claims for money as compensation for the property sought to be expropriated and claims for money as damages to other property.”
*574 The trial court appointed Keith Doley as attorney to represent the deceased property owner, Mr. Burgess, and/or his unidentified heirs. La. C.C.P. arts. 5091, 5093, 5094, 5095, and 5096. Prior to trial Mr. Doley filed an exception of unconstitutionality of the expropriation under La. Const, art. I, § 4(B) and (H). The trial court referred the exception to the trial on the merits. The Louisiana Attorney General was served with a copy of the exception. La. C.C.P. art. 1880. However, he did not appear in these proceedings.
During the time between the filing of the petition for expropriation and the judgment expropriating the property, the Bur-gesses neglected opportunities to avoid the expropriation procedure. As stated in New Orleans Redevelopment Association v. Stroughter, 03-1085, pp. 9-10 (La.App. 4 Cir. 12/17/03), 861 So.2d 940, 946, “NORA routinely dismisses these expropriation actions when it learns through inspection that the blight is being removed. NORA expressly communicated this policy to Dr. Alden ... [in a] letter, which stated that NORA will ‘continue its expropriation proceeding until there is evidence of work in progress.’” Id., p. 9, 861 So.2d at 946.
At trial on the merits NORA introduced voluminous documentary evidence of the administrative history of the property, including complaints of criminal activities, liens, notices, administrative hearing records, and photographs of trash and high weeds. Witnesses testified concerning the previous adjudication of the property by the City, as well as their observation of the blighted property as recently as the day before the trial. The court heard testimony of Ms. Burgess and her son as well as numerous witnesses called by NORA, including representatives of New Orleans Habitat for Humanity. On May 14, 2008, the court signed a judgment overruling the exception of unconstitutionality and granting the petition of NORA to expropriate the blighted Clouet Street property, assessing costs and fees against the deposit in the court registry being held for the property owners.
From that judgment Mr. Doley filed a devolutive appeal. This court permitted two amici curiae, Brenda Sumler, a property owner in litigation with NORA, and the Loyola Law Clinic, to file briefs in this court.
Ill
Mr. Doley assigns three errors in the trial court’s decision granting expropriation of the Burgess’ property to NORA. First, he contends that the Clouet Street property is not blighted. Second, he argues that the intent of NORA to transfer the property to a private party, Habitat for Humanity, makes the 17acquisition vio-lative of La. Const, art. I, § 4(B). Third, he argues that there can be no expropriation because La. Const, art. I, § 4(H) requires that expropriated property be offered first to the owners from whom it was taken before being offered to any other private person.
In her amicus curiae brief, Ms. Sumler, a defendant in a pending NORA expropriation suit, argues that the “plasticity” of blight definitions by which there may be future expropriations will disproportionately impact the poor and will threaten the interests of middle and upper-income property owners. She contends that the language of the new amendments is clear.
Amicus Loyola Law Clinic contends that although the Burgess property was blighted and as such could be expropriated by NORA to remove a threat to health or safety, other properties in the city will require resolution. It seeks the remand of this case to the trial court to resolve the “constitutional issues” arising between the provisions of La. Const, art. I § 4(B) and *575 (H) because the amicus notes that the trial court did not rule on the disposition of the expropriated property to a private person other than the owner from whom the property was taken.
IV
We turn first to Mr. Doley’s argument that the property is not blighted. His argument implies that we should make a determination of whether the property is blighted as a matter of fact. Such a determination by a court in an expropriation proceeding is unjustified. The separation of powers set forth in the United States Constitution and the Louisiana Constitution requires that the courts recognize executive and legislative authority as the source of expropriation. A decision to expropriate is an executive decision not primarily reviewable in the courts. The legislature creates a procedure, such as La. R.S. 33:4720.59, to insure that due | ¿process rights of the property owner are respected. The judiciary chiefly oversees the proceedings on the amount of compensation to be paid the property owner whose property is expropriated.
The U.S. Supreme Court in Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), enunciated the respect which the courts must give to the legislative branch in expropriation matters: “[I]f a legislature ... determines that there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.” Id. at 243-244, 104 S.Ct. 2321.
There is, of course, a role for courts to play in reviewing a legislature’s judgment of what constitutes a public use, even when the eminent domain power is equated with the police power. But the Court in Berman made clear that it is “an extremely narrow” one. (emphasis added)
Id. at 240, 104 S.Ct. 2321.
Nationwide, the sanctity of private property has always been subject to the police power of the state.[6] For instance, the court in New York City Housing Authority v. Muller, 270 N.Y. 333, 1 N.E.2d 153 (1936), held that condemnation for slum clearance was a public use and purpose. The U.S. Supreme Court enunciated this principle in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), and Midkiff, supra. Berman addressed the expropriation of a viable business property, a store, to redevelop Washington, D.C., slum areas by utilizing the District of Columbia Redevelopment Act of 1945. Eminent domain permitted redevelopment and possible sale of the condemned lands to private interests. The Court stated:
We deal ... with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the |^purposes of government.... In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia or the States legislating concerning local affairs.... This principle admits of no exception merely because the power of eminent domain is involved....
Public safety, public health, morality, peace and quiet, law and order-these are *576 some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it.... Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river, (emphasis added).
Berman, 348 U.S. at 32-33, 75 S.Ct. 98 (citations omitted).
The Midkiff Court stated that “the ‘public use’ requirement ‘is coterminous with the scope of a sovereign’s police powers.’ ” (emphasis added). Midkiff, 467 U.S. at 240, 104 S.Ct. 2321. Further,
The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. The Court long ago rejected any literal requirement that condemned property be put into use for the general public.... [Gjovernment does not itself have to use property to legitimate the taking; it is only the taking’s purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause....
Id. at 243-44, 104 S.Ct. 2321.
Although the sudden and vast aggravation of urban decay in the aftermath of Katrina intensified efforts to deal with blight,[7] Louisiana provided constitutional authority for expropriation of property and for the use of police power to address | mblight or hazardous property well before the 2006 constitutional amendments and the public’s post-Katrina activism to “bring back New Orleans.”[8]
Article I, Section 4 of the Louisiana Constitution, pursuant to Acts 1989, No. 849, § 1, stated, in pertinent part:
Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. (B) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a par *577 ty has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction. ...
(emphasis added).
La. Const, art. I, § 4(A)[9] subjects the right of every person to acquire, own, and use private property “to reasonable statutory restrictions and the reasonable exercise of the police power.” (emphasis added).
In 2004, in response to increasing urban blight in New Orleans, the Louisiana Legislature reorganized a long-standing urban-renewal entity, New Orleans Redevelopment Authority, a political subdivision and agency of New 11T Orleans, and gave it broad powers.[10] Its purpose was to take positive action to cure burgeoning deterioration of properties in the city, to reclaim properties creating public health hazards, to establish projects to create growth and revitalization, and to make the city a safer, more attractive place to live and work. The city’s population had decreased,[11] and the housing stock consisted of large quantities of unsafe dwellings unsuited for habitation. In particular, the legislature endowed NORA with the power to expropriate, to transfer, to purchase, and otherwise address blighted properties. See La. R.S. 33:4720.56 and 4720.59.[12] NORA was authorized to expropriate single or individual pieces of property which were hazardous or blighted. La. R.S. 33:4720.59. Additionally, separate statutes authorized NORA to undertake and carry out community improvement projects, to create community improvement plans after the City, upon advice by the City Planning Commission, determines an area to be a slum or blighted, or both, and appropriate for a community development project. La. R.S. 33:4720.56 and 4720.57.
The legislative authorization to the executive branch, in this case acting through NORA, is the public policy determination that blighted property is subject to expropriation. The factual and legal determination whether a particular property is blighted is not made in the first instance by the courts, but by the executive, in this case the City’s administrative departments. The executive branch, through its authorized administrative procedures, adjudicated the subject property *578 blighted. |12Although there is available to a property owner judicial review of the administrative adjudication, it must be timely invoked by the property owner. As noted earlier, the property owners did not seek judicial review of the blight adjudication pursuant to La. R.S. 49:964. Therefore, the factual and legal determination that the subject property is blighted for the purposes of expropriation is not an open judicial question in this case.
V
Mr. Doley’s second argument addresses itself to the application of La. Const, art. I, § 4(B), as amended, to the facts of this expropriation. On June 23, 2005, two months before Katrina, the United States Supreme Court in Kelo v. City of New London, Connecticut, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 489 (2005), struck an apparent blow against property owners when it ruled in favor of a local government’s using eminent domain to “upwardly mobilize” realty that might yield more financial return for the local government or boost economic development for the community. Kelo permitted a government agency to expropriate private land which was not blighted[13] to transfer it to a more lucrative enterprise and hopefully thereby increase tax revenue and bring new jobs or, as Justice O’Connor said in a strong dissent: “to replace Motel-6 with a Ritz-Carlton.” [14]
Galvanized by the implications of the ruling, state legislatures nationwide responded by passing statutes to contain or curtail what was viewed as overreaching judicial activism.[15] And beginning on August 29, 2005, Louisiana | ^suffered the effects of Hurricanes Katrina and Rita. New Orleans sustained wind and flood damage to vast areas of the city. Legislators’ concern for the implications of Kelo was heightened by their concern for their constituencies containing both previously blighted properties and an enormous array of properties newly devastated and/or blighted by Katrina damage.
In the first regular session of the Louisiana Legislature following Hurricane Katrina and Kelo, more than twenty-one separate bills were introduced in response to Kelo, ultimately producing Senate Bill 1 (Act 851) which culminated in the amendment of La. Const, art. I, § 4(B), and House Bill 707 (Act 859), which culminated in the approval of La. Const, art. I, § 4(H). The legislators nearly unanimously agreed with Justice O’Connor’s dissent in Kelo and rejected expropriation of non-blighted property for economic development and transfer to a private party. This legislative response contrasts to the non-reactions to two Louisiana cases which foreshadowed the U.S. Supreme Court’s Kelo ruling in that in each ease a Louisiana court interpreted a public purpose when non-blighted property was expropriated for benefit to its respective community. *579 Both cases on the issue involve a municipality’s expropriation of non-blighted property for the economic benefit of the community as a broad construction of “public use.” See City of Shreveport v. Chanse Gas Corp., 34,958 (La.App. 2 Cir. 8/22/01), 794 So.2d 962, 969 (affirming expropriation of property for a convention center and hotel as an economic benefit, thus a “public purpose,” and acknowledging that expropriation laws are to be construed “strictly” with regard to art. 1, § 4 of the Louisiana Constitution); Town of Vidalia v. Unopened Succ. of Ruffin, 95-580 (La.App.14 3 Cir. 10/4/95), 663 So.2d 315, 319 (stating that the Riverfront Development Project “will stimulate economic growth in Concor-dia Parish .... [and] will contribute to the general welfare and prosperity of the community” and affirming the trial court’s order expropriating the property to the town).
At the final House vote for adoption of Senate Bill 1, Representative Emile “Pep-pi” Bruneau attacked the Kelo majority decision, saying, “Houses [involved in Kelo ] were not blighted. No. Were they abandoned? No. Were they livable? Yes.”[16] He described the purpose of the amendment as to “prevent expropriation by a public entity of a person’s property for economic development and flip that property to a third person.... We are strictly talking about economic development.If we didn’t have the Kelo case, we wouldn’t have a problem.”[17] Representatives Mike Strain and Emile “Peppi” Bruneau echoed Justice O’Con-nor’s reference to the danger of replacing a Motel-6 with a Ritz-Carlton.[18] Representative Glen Ansardi summarized the purpose of Senate Bill 1: placing a prohibition “in the Constitution against expropriation for economic development purposes if property is sold to a third person.”[19] Concomitantly, the legislators recognized that expropriation is a valid use of police power in order to abate threats to public health or safety.
Pursuant to Acts 2006, No. 851, § 1, and No. 859, § 1 were adopted by the voters in a statewide election. On October 10, 2006, the governor proclaimed the adoption of the amendments. Art. I, § 4 now states, in pertinent part:
Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is [ ir,subject to reasonable statutory restrictions and the reasonable exercise of the police power.
(B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution, property shall not be taken or damaged by the state or its political subdivisions (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
(2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, “public purpose” shall be limited to the following:
(a) A general public right to a definite use of the property.
*580 (b) Continuous public ownership of property dedicated to one or more of the following objectives and uses;
(i) Public buildings in which publicly funded services are administered, rendered or provided.
(ii) Roads, bridges, waterways, access to public waters and lands, and other public transportation, access, and navigational systems available to the general public.
(iii) Drainage, flood control, levees, coastal and navigational protection and reclamation for the benefit of the public generally.
(iv) Parks, convention centers, museums, historical buildings and recreational facilities generally open to the public.
(v) Public utilities for the benefit of the public generally.
(vi) Public ports and public airports to facilitate the transport of goods or persons in domestic or international commerce.
(c) Removal of a threat to public health or safety caused by the existing use or disuse of the property.
(3) Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose pursuant to Subpara-graph (1) of this Paragraph or Article VI, Section 23 of this Constitution.
(4) Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question....
(H)(1) Except for leases or operation agreements for port facilities, highways, qualified transportation facilities or airports, the state or its political subdivisions shall not sell or lease property which has been expropriated and held for not more than thirty years without first offering the property to the original owner or his heir, or, if there is no heir, to the successor in title to the owner at the time of expropriation at the current fair market value after which the property can only be transferred by competitive bid open to the general public. After thirty | 16years have passed from the date the property was expropriated, the state or political subdivision may sell or otherwise transfer the property as provided by law.
(emphasis added).
The 2006 amendment of art. I, § 4(B) lists two affirmative reasons for the state or its agency to take property — sections (a) and (b). These two uses exemplify the term “eminent domain,”[20] defined by Black’s Law Dictionary as follows:
... the inherent power of a governmental entity to take privately owned property, esp. land, and convert it to public use, subject to reasonable compensation for the taking.
These two sections of the amended article contemplate converting the existing positive use of space, i.e. non-blighted space, to a more utilitarian use benefiting the state and polis, such as areas for public use, such as utilities, parks, roadways, and sewerage plants.
The third category, section (c), differs from the preceding two: it authorizes the *581 state or its agency to take — to expropriate — in order to protect the polis, to eradicate a harm to the people, to exercise its police power to ensure public safety. Whether the state retains custody of the expropriated property or eventually disposes of it is not part of the constitutional article. Section (c) addresses only “removal,” not any additional action, as the case subjudice exemplifies.[21]
117Mr. Doley and NORA argue that the amended § 4(B) can be interpreted as ambiguous, notwithstanding the clear history of our legislature’s otherwise unwavering support of expropriation in order to extirpate urban blight. They are supported in their argument about the ambiguity of § 4(B) by at least one commentator, Professor Alexander:
The amendment to section 4(B) also contains an express prohibition on expropriations for predominant private use and on expropriation for subsequent transfers to private entities. This presents the question as to what rights NORA has with respect to further disposition of such properties. If NORA uses expropriation to acquire property in order to remove “a threat to public health or safety caused by the existing use or disuse of the property,” is it barred from subsequently transferring this property to a new owner? A strict textualist interpretation is that this clause is found within the paragraph setting forth the definition of “public purpose,” which appears to have been the point of this amendment. An expropriation for a “public purpose” is limited by a prohibition of expropriations for use by or transfers to third parties. The problem with this strict textualist approach is that it creates the entirely anomalous situation in which NORA can expropriate blighted properties, but never transfer them to a third party.
An alternative policy-based interpretation of this amendment would construe the key word “for” in the limiting clauses as indicative of prohibited dominant purposes of the expropriation, and not as a limitation on subsequent use when the dominant purpose for acquisition is public health and safety. The grammatical structure of this clause supports this interpretation in that the threshold specification that “property shall not be taken or damaged” is followed by the two specific descriptions.... In both instances the term “for” specifies two unacceptable justifications for taking ... property. In its normal and common meanings “for” is a preposition indicating “in order to,” or “with the purpose of.” When property is being expropriated because it is in the first instance a “threat to public health or safety,” its *582 expropriation is justified on this ground.... ”
Alexander, supra, at 740-41.[22] Evidence at trial showed that the Clouet Street property was such a “threat to public health or safety.” Regardless of any perceived ambiguity in the interpretation of § 4(B), there is no doubt that the | lspurposes for the amendment had no objective of restricting expropriation of blighted property. Discussing Louisiana’s 2006 amendment, Professor Marcel-lo observed, “The anti-Kelo thrust of Amendment 5 was directed at takings for purposes of economic development; it specifically preserves authority for takings based on public health or safety.”[23] Id. at 774 n. 51 (Winter 2007).
However, the learned trial judge did not find any ambiguity in the constitutional provision, and stated from the bench:
[T]he New Orleans Redevelopment Authority has proved its case appropriately for the expropriation of this property pursuant to the statutory guidelines given that this property is blighted, has been blighted since 1995, has been out of commerce and has been appropriately expropriated under those statutes.
The question becomes whether or not the 2006 amendments to the Constitution put further restrictions on NORA and/or prevent NORA in the exercise of its authority from putting this property back in commerce by transferring it to a private owner and that is the question .... This state’s legislature reacted harshly to that as many legislatures across the country did and passed these amendments which we’re now considering. These amendments do not address themselves to blighted property and specifically includes in the list of those things that are for public purposes the 4(B)(2)(c), so it would be nonsensical to read these amendments to allow a city its statutory authority to expropriate from someone who allowed them property to become blighted, to allow tax liens to exist and not pay those tax liens, to then cancel those tax liens and then offer the property back to that person to put back into commerce when it is that person’s neglect of the property that caused it to be blighted in the first instance. That would be a nonsensical reading of these amendments, the most applying [sic] statutory and constitutional construction....
Mr. Doley argues, in effect, that there is an irreconcilable dichotomy embedded in § 4(B) whenever property which is to be expropriated is intended for subsequent private ownership by a third party. He argues that notwithstanding the unquestioned right of a public body to expropriate private property which is a threat to the public health and safety, the right is abrogated if its predominant use |n)will be by any private person or if its ownership is to be transferred to any private person or entity.
This is not an irreconcilable dichotomy. Historically, it has long been recognized that public purpose or even public use does not exclude private ownership. Midkiff, 467 U.S. at 243-44, 104 S.Ct. 2321 (“The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. The Court long ago rejected any literal requirement that condemned property be put into use for the general public....”).
*583 Section 4(B)(4) itself allows expropriation “by any private entity authorized by law to expropriate.” It can only be done “for a public and necessary purpose.”[24] Clearly, the constitution contemplates that private property may be expropriated “for a public and necessary purpose” and may enter the ownership of a private party. It would indeed strain constitutional interpretation to argue that the prohibition urged by Mr. Doley was a necessary reading of § 4(B)(1) when § 4(B)(4) expressly provides that a private entity can own property which it expropriated.
The evil which the 2006 amendments sought to address, and to prohibit in Louisiana, was the expropriation of private property for the use and ownership of another private person by asserting as the public purpose “economic development.”[25] La. Const, art. I, § 4(B)(3).
Section 4(B)(2)(c) unambiguously provides that this type of expropriation is a public purpose. Consequently, it is a taking which is authorized. This property | gphas not been taken for the predominant use of a private party nor for the purpose of transferring the property to a private person. It has been taken for the public purpose of removing a threat to the public health or safety.
Justice Kimball, writing for the Louisiana Supreme Court, stated clearly in Ocean Energy, Inc. v. Plaquemines Parish Gov’t., 04-0066, p. 1 (La.7/6/04), 880 So.2d 1, that when a constitutional provision is ambiguous or a plain reading could lead to absurd consequences, courts should evaluate “the object sought to be accomplished by its adoption, and the evils sought to be prevented or remedied, in light of the history of the time and the conditions and circumstances under which the provision was framed.” Id., 04-0066, p. 7, 880 So.2d at 7. The legislative history of Senate Bill 1 shows that the Louisiana Legislature’s post-Katrina-and-Rita legislative concern was to address the possibility of expropriations being used to acquire non-blighted property in order to transfer it to third parties for economic development — the Kelo stratagem which provoked nationwide furor. The sponsors of the legislation were not concerned with restricting the use of expropriation to remove a threat to public safety or health caused by existing use or disuse of the property.[26] Such expropriations apparently were never questioned or criticized during the legislative consideration of Senate Bill 1.
La. R.S. 33:4720.59[27] sets forth a clear procedure in conjunction with the adminis *584 trative hearing procedures of R.S. 13:2575 and 2576. NORA comported |21 with all the requirements of the process when it sought expropriation of the Clouet Street property because the blight and hazardous conditions on the property created a danger to public safety and sanitation.
The potential subsequent transfer of the blighted property to third parties who are private entities is incidental to the duty of a municipality to remove a public threat to the health and safety of its occupants. Transfer of expropriated property to third parties is not absolutely proscribed by § 4(B)(l)’s requirement that “property shall not be taken ... (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.” This proscription merely prevents expropriations initiated with the goal of transferring private property to a specific recipient, rather than as a bar to expropriation with a legitimate basis that may include a subsequent transfer.
As Justice Weimer wrote in Sherwood Forest Country Club v. Litchfield, 08-0194, p. 8 (La.12/19/08), 998 So.2d 56, 62, on rehearing rev’d and remanded on proc. grounds, 6 So.3d 141 (La.2/13/09):
It is true that where statutes are clear and unambiguous no interpretation thereof may be attempted by the courts .... [citations omitted] Further, the Louisiana legislature has recognized that “[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation maybe made in search of the intent of the legislature. La. C.C. art. 9.
Accordingly, the district court found no ambiguity in the statute or constitutional article. We find the language of § 4(B) to be clear and unambiguous. We find the distinction between its parts (2)(a) and (b), pertaining to eminent domain, and part (c), pertaining to police power to control health and safety ^hazards to the public, to be clear. Thus we find no error in the district court’s ruling.
VI
Mr. Doley finally argues that the expropriation of the Burgess property should be reversed because La. R.S. 33:4720.59 is unconstitutional in light of § 4(H)(1).[28] We do not reach an opinion or make a ruling on the issue raised by Mr. Doley: whether § 4(H)(1) requires that the expropriated property must first be offered to the original owner or his heir at the current fair market value. The case before us does not present a justiciable controversy on this issue. The arguments of the parties and the testimony at trial raise the possibility of a future transfer from NORA to New Orleans Habitat for Humanity.[29] Importantly, NORA, in its *585 petition for expropriation did not request any relief other than the expropriation of the property; it did not seek court authority to transfer the property to any other party, private or otherwise. Moreover, Mr. Doley, for his part, did not seek any injunctive relief[30] against NORA in these proceedings, nor did he request a declaratory judgment[31] on this issue. Consequently the district court’s judgments which are before us for review neither granted nor denied the authority to NORA to transfer the property to a third party.
123As the Louisiana Supreme Court stated in St. Charles Parish School Board v. GAF Corp., 512 So.2d 1165, 1170-71 (La.1987) (on rehearing):
It is well settled that courts will not decide abstract, hypothetical or moot controversies or render advisory opinions with respect to such controversies .... In order to avoid deciding abstract, hypothetical or moot questions, courts require that cases submitted for adjudication be justiciable, ripe for decision, and not brought prematurely.... [, a] dispute which involves the legal relations of the parties who have real adverse interest, and upon which the judgment of the court may effectively operate through a decree of conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.... The doctrine that courts will not hear moot cases serves two complementary purposes: it prevents the useless expenditure of judicial resources and assures that the courts will not intrude prematurely into policymaking in a manner that unnecessarily constrains the other branches of government.
(emphasis added, citations omitted).
“Courts may not decide cases that are moot, or where no justiciable controversy exists.” Louisiana Assoc. Gen. Contractors, Inc. v. State of La., 95-2105 (La.3/8/96), 669 So.2d 1185, 1193.[32]
VII
In conclusion, we find that the administrative adjudication of this property as blighted according to the legislation regulating expropriation is binding upon this court. We also find that La. Const, art. I, § 4(B) has not been violated by the expropriation of the subject property. Finally, we are not presented with a justiciable controversy as to Mr. Doley’s claim that La. Const, art. I, § 4(H) has been violated.
I24DECREE
Accordingly, we affirm both the judgment overruling the exception of unconstitutionality and the judgment granting expropriation of the Clouet Street property.
AFFIRMED
*586 LOVE, J., concurs.
TOBIAS, J., concurs in the result and assigns reasons.

. Notice of Judgment, Case No. 2002-616-PB.

. The Burgesses' property is not a part of any community development project of NORA. Indeed, as John J. Costonis observes in New Orleans, Katrina and Kelo: American Cities in the Post-Kelo Era, 83 Tul. L.Rev. 395, 404 (2008), NORA has yet to create a single com *572 munity development project, despite the broad authorization for such urban renewal and blight eradication on a larger scale provided by the statutes.

. The estimated cost of breaking up and removing the slab, around $1500, was deducted from the $10,000 appraised value of the property by the two appraisers of the property in conjunction with the expropriation proceedings.

. These statutes set forth administrative procedure for municipal hearing officer(s) to conduct hearings on violations of public health, housing, fire code, environmental and historic district ordinances, to issue orders, levy fines, record judgments; and setting procedure to appeal determinations of violations. La. R.S. 13:2576 sets forth the procedure for enforcement of liens against the property, including sale of die property, and distribution of proceeds of any sale to pay fines, taxes, liens, and encumbrances on the property.

. See La. C.C. art. 2369.1 and La. C.C.P. art. 3097(B).

. Scott P. Ledet, The Kelo Effect: Eminent Domain and Property Rights in Louisiana, 67 La. L.Rev. 171, 178-183 (2006).

. See Frank S. Alexander, Louisiana Land Reform in the Storms’ Aftermath, 53 Loy. L.Rev. 727, 746-50 (Winter 2007).

. For example, Section 1 of 1984 La. Acts 155 describes blighted property as "those premises which have been declared vacant, uninhabitable, and hazardous by the Department of Safety and Permits of the city of New Orleans. In determining whether any premises are vacant, uninhabitable, or hazardous, the Department of Safety and Permits shall consider the following: (1) Any premises which because of physical condition are considered hazardous to persons or property; (2) Any premises declared to be a public nuisance; (3) Any premises declared to be a fire hazard; or (4) Any premises declared to be vermin infested or lacking in facilities or equipment required by the housing code of the City of New Orleans.”

. Section A was not altered; Amendment 5 of the 2006 Louisiana Acts, No. 851, amended Louisiana Constitution article I, § 4(B). Amendment 6 of the 2006 Louisiana Acts, No. 859 amended Louisiana Constitution article I, § 4 by adding § 4(H).

. NORA was originally called Community Improvement Agency (CIA) in 1968 (1968 La. Acts 1970). In 1994, the agency was reorganized and named NORA (1994 La. Acts 65, 135, 3d Extraordinary Sess.). Act 349 of 2004 codified the previous acts creating CIA and NORA, see La. R.S. 33:4729.51-72 (2007).

. Official U.S. Census states the population of Orleans Parish as follows: 1970: 593,471; 1980: 557, 515; 1990: 496,938; 2000:484,-674; 2003:467,934, and 2006 (estimated) 223,388. Between 1970 and 1980 the decline in New Orleans (excluding suburban areas) was 6.1%; between 1980 and 1990 the decline was 10.9%; between 1990 and 2000, 2.5%, and between 2000 and 2003, 3.5%. The decline from April 1, 2000 to July 1, 2006 was 53.9%.

. Earlier the legislature created a statutory provision to attack urban blight and health hazards: La. R.S. 19:136, created by Acts 2003, No. 984, § 1, as amended by Acts 2004, No. 755, § 1, as amended by Acts 2006, No. 196, § 1.

. “There is no allegation that any of these properties is blighted or otherwise in poor condition; rather, they were condemned only because they happen to be located in the development area.” Kelo, 545 U.S. at 475, 125 S.Ct. 2655 (2005).

. Id. at 503, 125 S.Ct. 2655 (O'Connor, J., dissenting).

. Loyola Law Review’s Winter 2007 Issue contained a "Symposium: Revitalizing Com-munily Assets: Blighted, Abandoned and Tax Adjudicated Property and Land Use in Post-Katrina New Orleans, 53 Loy. L.Rev. 763; in it David A. Marcello wrote: "Louisiana, more than most other states, exhibited a relentless determination to embed anti-Kelo expropriation restrictions in its constitution.” Housing Redevelopment Strategies in the Wake of Katrina and Anti-Kelo Constitutional Amendments: Mapping a Path Through the Landscape of Disaster, 53 Loy. L.Rev. 763, 767 (Winter 2007).

. Louisiana House of Representatives May 23, 2006 Session at 3:01.

. Louisiana House of Representatives May 2, 2006 Session at 2:18-2:21.

. May 23, 2006 Session at 2:09, 3:03.

. May 2, 2006, Session at 2:21.

. BLACK'S LAW DICTIONARY 562 (8⅛ ed.2004). John E. Nowak & Ronald D. Rotunda, Constitutional Law § 11.11, at 424-25 (4th ed. 1991), attribute the term to Grotius, the seventeenth-century legal scholar, who believed that the state possessed the power to take or destroy property for the benefit of the social unit.'

. Multiple results emanate from a blight determination: municipal criminal charges for "criminal blighting of property," La. R.S. 13:107.3; police power to enforce housing codes and address public nuisances, making the owner correct hazards or allow the government to correct them, with concomitant hens and fines, whereby only by enforcement of the hens when the owner fails to pay the fines and charges does the government obtain the property through a foreclosure sale. La. R.S. 13:2575 authorizes a local governmental administrative agency to issue a finding that a property is in violation of a "public health ... ordinance," and to levy fines and penalties, to take remedial action (e.g. mowing dangerously tall weeds, demolish house) and place liens on the property to secure those expenses. La. R.S. 33:4720.59 provides for involuntary transfer of ownership from the original owner to the redevelopment authority, requiring that compensation be paid to the owner, thereby eliminating or curing the harmful characteristics of the property. See Alexander at 749-50. NORA can acquire blighted property by purchase as well, as set forth in its enabling statutes. La. R.S. 33:4720.57.

. Full citation of the Alexander article appears on page 8, supra, note 10.

. See fn. 15, Marcello at 774.

. There is a distinction in the role of the judiciary when determining whether a purpose is public and necessary when it is a private party, as opposed to the state or its political subdivisions.

. Even this intention was not unqualified as evidenced by the explicit exemption reserved in La. Const, art. VI, § 21.

. La. Const, art. I, § 4(B)(2)(c).

. See also the less precise and detailed statute which authorizes expropriation by the City of New Orleans, La. R.S. 19:136, enacted by Acts 2003, No. 984, § 1 as amended by Acts 2004, No. 755, § 1, eff. July 6, 2004; Acts 2006, No. 196, § 1, which states: "In an effort to control the rising number of abandoned or blighted properties throughout the state and to slow urban blight, the legislature finds it necessary to implement a mechanism by which the city of New Orleans ... [⅛] empowered to more readily obtain abandoned or blighted properties. The provisions of this Part are intended to provide a means by which governing authorities may revitalize economically depressed areas by placing abandoned or blighted properties back into the economic stream of commerce through the rehabilitation of the abandoned or blighted property. The procedure created by this Part shall be in addition to any other procedure authorized by law.”

. While the exception refers to La. R.S. 33:4720.55 and 4720.60, the exceptor apparently meant to refer to 4720.59, which applies to individual blighted property.

. New Orleans Habitat for Humanity and NORA confected an agreement regarding a list of properties which had been adjudicated by the City of New Orleans. The agreement, dated February 14, 2005, was tentative and loose regarding the various properties. It stated, "At any point in the acquisition process, NOAHH shall have the option ... [to] request that the acquisition process cease on its behalf. Upon the exercise of such option by NOAHH, neither party shall have any further obligation under this agreement as to the specific lot or lots so rejected by NOAHH.” (Exhibit P-18) The document did not constitute a formal agreement to purchase. Habitat has advanced building projects throughout New Orleans, using volunteers and contributions of materials, and involving "sweat equity” to help provide home ownership for the elderly, the low-income families, and the challenged citizenry of New Orleans both before and after Katrina. As is public knowledge, Habitat and other eleemosynary organizations *585 and individual citizens and celebrities have formulated and carried out numerous projects in the effort to recover New Orleans’ diminished housing stock post-Katrina. The pertinent events in the Burgess property’s history, however, pre-date Katrina.

. La. C.C.P. art. 3601, et seq.

. La. C.C.P. art. 1871, et seq.

. Although it forms no part of the basis for our decision, we cannot overlook the unusual posture that this property is in. The one-half undivided interest which formerly belonged to Ms. KiUoria Burgess is now owned by NORA as the judgment of expropriation as to her interest is final. The remaining one-half interest is under the administration of Mr. Do-ley, the court-appointed attorney for the absentee. We are uncertain as to the extent of the standing of an attorney for an absentee to demand the right to repurchase an undivided one-half interest in expropriated property. Finally, the legal status of Mr. Joseph Burgess, III, is unclear, his not having not been put into possession and not having substituted himself as a party defendant.