[Cite as *Henry Cty. Bd. of Commrs. v. Rettig*, 2020-Ohio-2787.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HENRY COUNTY

**BOARD OF HENRY COUNTY COMMISSIONERS,**

    **PLAINTIFF-APPELLEE,**               **CASE NO. 7-19-11**

    **v.**

**TODD RETTIG, ET AL.,**                  **O P I N I O N**

    **DEFENDANTS-APPELLANTS.**

---

**Appeal from Henry County Common Pleas Court
Trial Court No. 18 CV 0142**

**Judgment Affirmed**

**Date of Decision: May 4, 2020**

---

**APPEARANCES:**

    *Zachary J. Murry* **for Appellant**

    *Katie L. Nelson* **for Appellee**

Case No. 7-19-11

**SHAW, P.J.**

{¶1} Defendants-appellants, Todd Rettig[1] and Paula Rettig (collectively, "the Rettigs"), bring this appeal from the September 10, 2019, judgment of the Henry County Common Pleas Court granting the motion for summary judgment filed by the Board of Henry County Commissioners ("the Board") in an eminent domain action. As a result of granting the Board's motion for summary judgment, the trial court dismissed the Rettigs' counterclaims against the Board.

{¶2} The Rettigs also appeal the September 10, 2019, judgment of the Henry County Common Pleas Court denying the Rettigs' motion to dismiss the appropriation action on the basis that the appropriation petition was "defective." On appeal, the Rettigs argue that the trial court erred by granting the Board's summary judgment motion and by denying the Rettigs' motion to dismiss.

*Background*

{¶3} The City of Napoleon, located in Henry County, is physically divided into northern and southern portions by the Maumee River. As early as 2001 or 2002, there were discussions regarding building an additional bridge across the river. In 2003, the City of Napoleon approved a "comprehensive master plan," which recommended the creation of a second river crossing via a new bridge as a critical infrastructure improvement.

---

[1] Todd Rettig is the custodian for Kyle Rettig under the Ohio Transfers to Minors Act.

Case No. 7-19-11

{¶4} A study was commissioned for a potential "New Maumee River Crossing Project" and a final report was issued on March 11, 2009. The report identified numerous reasons why a new bridge across the Maumee River was needed:

> **First, there is a need to provide a more direct transportation corridor between the two designated industrial development areas that are located on the east side of the city, both north and south of the Maumee River. Secondly, an option is needed to improve emergency response times when traffic is disrupted on the existing bridge that crosses the river on SR 108 in the city. Thirdly, although the majority of Napoleon's developed areas are located on the north side of the river, the south side of the river contains the largest single employer in Napoleon, the world's largest Campbell's Soup plant, which employs an average of 1,200 people. The Henry County fairgrounds, several small businesses, and residential areas also exist on the south side of the Maumee River.**

(Def.'s Ex. D at 1-1). The report also stated that having only a single river crossing at SR 108 caused significant traffic congestion and delays in downtown Napoleon during peak traffic periods.[2] This included heavy truck traffic going through downtown Napoleon.

{¶5} The report identified four potential sites for a new bridge over the Maumee River. Early cost estimates for building a bridge were between $14.5-16.5 million. A "no-build" alternative was also considered, which evaluated the potential of meeting the city's needs through various measures short of building a new bridge.

---

[2] The record indicates that there were additional river crossings outside of town, but they did not alleviate the problems.

{¶6} After the report was complete on the project, a "feasibility" study was undertaken, which analyzed traffic and crashes in the area in order to determine the necessity of the bridge project and, if the bridge project was necessary, which of the potential build sites would be the best. The feasibility study was completed in 2013.

{¶7} The completed feasibility study determined that a "no-build" option would not address the traffic and access concerns. (Schumm Depo at 48). The four initial build sites were narrowed to two options, and the final recommendation from the feasibility study was that the new bridge be an extension of "Industrial Drive." The extension of Industrial Drive would connect Riverview Avenue on the south side of the Maumee River via a new bridge to State Route 110 on the north side of the Maumee River.

{¶8} During the time that the feasibility study was being conducted, there were attempts by the Henry County Engineer to secure funding for the bridge through means separate from the City of Napoleon and Henry County such as through state and federal grants and private donations. Applications were made to the Transportation Review Advisory Committee ("TRAC"), a funding agency from the State of Ohio, which accepted applications approximately once per year. Initial applications to TRAC were denied, and TRAC provided feedback that securing some private funding would make the application more attractive. (Dahl Depo. at 28); (Schumm Depo at 59, 119). Financial assistance for the bridge was then sought

from the area's largest employer, Campbell's, first in the amount of $1.5 million. Although Campbell's never agreed to contribute $1.5 million, Campbell's did eventually agree to contribute over $400,000. Then, on the sixth attempt at applying for a TRAC grant, the application was approved and additional funding was received for the bridge project.[3] (Schumm Depo. at 22). However, applications through a federal grant program called "TIGER" were rejected on the three occasions that they were submitted.

{¶9} Over the next several years bridge and road plans were submitted and completed. In the meantime, additional funding was still sought through various sources. Once plans for the road and bridge had essentially been finalized, initial work proceeded on the bridge such as clearing trees and acquiring property. A deal was made with one property owner, but a deal could not be made with the Rettigs, who owned property along the river.

{¶10} On November 6, 2018, the Board met in regular session and passed a resolution indicating that the "New River Bridge Project" was proceeding and that construction would require the acquisition of .7857 acres of property from the Rettigs. The resolution indicated that the acquisition of the Rettigs' property was necessary, and that they had been unable to negotiate a fair price.

---

[3] Regarding the difficulty of acquiring a grant through TRAC, a Henry County Commissioner testified that TRAC had something like "$25 billion worth of good projects and $12 billion to spend." (Hastedt Depo at 31).

{¶11} An appraisal of the property was conducted by Martin & Wood Appraisal Group, LTD. The appraisal valued the .7857 acres of riverfront property proposed to be taken at $27,500. In addition, the appraisal valued damage to the remaining parcel the Rettigs would still own at $6,900, for a total compensation award of $34,400.

{¶12} Subsequently the Board filed a Petition for Appropriation of the Rettigs' property on November 16, 2018. The petition attached numerous exhibits including, *inter alia*, the legal description of the property, a copy of the Board's resolution, a title report, and the appraisal report of the Rettigs' property.

{¶13} On December 18, 2018, the Rettigs filed an answer containing affirmative defenses and counterclaims. The Rettigs' first counterclaim requested that the trial court make a declaratory judgment that the Board had abused its eminent domain power and that the Board's actions were in violation of R.C.163.021 because the appropriation in this case was not for "public use."

{¶14} The Rettigs also filed counterclaims seeking preliminary and permanent injunctive relief, claiming that the new road and bridge were for the "sole and exclusive benefit of Campbell Soup * * * and not the general public." (Doc. No. 11). The Rettigs further asserted that there was a conspiracy between the Board and Campbell's Soup. The Rettigs alleged that the new bridge would serve "no other purpose than to act as a dedicated driveway and river crossing for defendant

Campbell." (*Id.*) The Rettigs alleged that Campbell's had been a "main" source of funding for the bridge project. Attached to the answer and counterclaim was a copy of a presentation that had been given to Campbell's in 2016 where there were potential proposals for renaming Industrial Drive in honor of Campbell's.

{¶15} On January 15, 2019, the Board filed a motion to dismiss the Rettigs' counterclaims. The Board argued that the making of a public, toll-free road was within its eminent domain authority, and that the Rettigs thus failed to state a claim upon which relief could be granted in their counterclaims. On February 12, 2019, the Rettigs filed a response to the Board's motion to dismiss contending that the road and bridge were not public, even if the Board was saying that they were. The Board filed a reply on February 28, 2019, reasserting that the bridge would be free, open to the public and for public use.

{¶16} On March 15, 2019, the trial court filed an entry indicating that in the Board's motion to dismiss the Rettigs' counterclaims, the Board was relying on information outside of the face of the Rettigs' pleading, therefore the matter had to be converted from a motion to dismiss to a summary judgment motion. The trial court then gave the parties leave to file summary judgment materials.

{¶17} On April 1, 2019, the Board filed for summary judgment on the Rettigs' counterclaims arguing that the taking of property for making or improving a toll-free road was a public use within the authority granted the Board under

Chapter 163 of the Revised Code. On June 14, 2019, the Rettigs filed a response to the Board's summary judgment motion asserting that there was a conspiracy between the Board and Campbell's and that the road was going to essentially "dead-end" at Campbell's. The Rettigs claimed that a number of deposition excerpts supported their arguments that the "public" road would only benefit Campbell's.

{¶18} Numerous depositions were taken in this matter and filed with the trial court. Individuals deposed included a former member of the community improvement corporation ("CIC"), the Henry County Engineer, members of the appraisal group, and a Henry County Commissioner who voted in favor of appropriating the Rettigs' property. Testimony was consistent that the road *would* benefit Campbell's and some businesses that were affiliated with Campbell's; however, the witnesses clarified that other businesses would also benefit from the new bridge, that the new bridge would likely help alleviate traffic in downtown Napoleon, particularly truck traffic, and that response times from emergency services would be improved. The uncontroverted testimony was that the road and bridge would be open to the public, free of charge.

{¶19} On June 28, 2019, the Board filed a reply in support of its summary judgment motion.

{¶20} Separately, on June 28, 2019, the Rettigs filed a motion to dismiss the appropriation petition claiming that there was a bald eagle's nest on the subject

property, and that the presence of the nest invalidated the Board's good faith offer and the legal description of the land in the appropriation petition. The Rettigs claimed that the petition was thus invalid, and that pursuant to Civ.R. 12(B)(1) the trial court was deprived of subject matter jurisdiction.

{¶21} On August 7, 2019, the Board filed a memorandum in opposition to the Rettigs' motion to dismiss, arguing that the presence of a bald eagle's nest on the subject property did not impact the land acquisition or the location of the bridge; rather the nest could merely impact what time of the year the bridge could be built in order to comply with ODOT standards. The Board indicated that the fact that there was a nest on or near the property was shared with ODOT so the environmental specialists could see what spacing requirements were necessary and when the build could occur. On August 19, 2019, the Rettigs filed a reply in support of their motion to dismiss.

{¶22} On September 10, 2019, the trial court filed an entry denying the Rettigs' motion to dismiss that had claimed the appropriation petition was defective due to the presence of the bald eagle's nest. The trial court reasoned that the presence of a bald eagle's nest on the property did not change the property's legal description, rather the presence of the nest was a timing and constructability issue for the bridge.

{¶23} Also on September 10, 2019, the trial court filed an entry granting the Board's motion for summary judgment against the Rettigs on the Rettigs' counterclaims for a declaratory judgment and for injunctions. The trial court reasoned that while the proposed bridge would benefit Campbell's Soup, it would link two public roadways, benefit countless truck drivers, and reduce traffic running through downtown Napoleon. The trial court stated that the Rettigs' contention that the bridge was to "nowhere but Campbell's" was misplaced as the record indicated that the project had a public purpose and was not for the exclusive use of a sole commercial enterprise. (Doc. No. 46).

{¶24} Once the trial court granted the Board's summary judgment motion, the trial court dismissed the Rettigs' counterclaims. The trial court then certified that there was no just cause for delay under Civil Rule 54(B). Subsequently, the trial court certified that there was no just cause for delay regarding the denial of the Rettigs' motion to dismiss under Civil Rule 54(B). The Rettigs now bring this interlocutory appeal, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The Trial Court committed reversible error by denying Defendants-Appellants' Motion to Dismiss Plaintiff-Appellant's Petition for Appropriation when the Petition had been rendered defective as a matter of fact and law and it failed to conform with the requirements set forth in Revised Code Section 163.01, *et seq.*, thereby divesting the Trial Court of subject matter jurisdiction in this civil action.**

**Assignment of Error No. 2**
**The Trial Court committed reversible error by entering summary judgment in favor of the Plaintiff-Appellee Henry County Board of Commissioners on Defendants-Appellees' Counterclaims for Declaratory Judgment and Preliminary and Permanent Injunction where the Plaintiff-Appellant's attempted appropriation of the Defendant-Appellants' property represents an impermissible use of the Plaintiff-Appellant's eminent domain power.**

*First Assignment of Error*

{¶25} In the Rettigs' first assignment of error, they argue that the trial court erred by denying their motion to dismiss the appropriation petition. Specifically, they argue that the description of the land did not comply with the requirements of R.C. 163.05, that the good faith offer did not comply with R.C. 163.04 because it did not take into account the bald eagle's nest on the property, and that the trial court erred by finding that even if the petition was somehow defective, it could have been amended. The Rettigs contend that the "incomplete" appropriation petition deprived the trial court of subject matter jurisdiction.

Standard of Review

{¶26} A trial court must grant a Civ.R. 12(B)(1) motion to dismiss for lack of subject-matter jurisdiction if the complaint fails to raise a cause of action cognizable by the forum. *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 80 (1989). When deciding whether to dismiss pursuant to a Civ.R. 12(B)(1) motion, a trial court is not confined to the allegations of the complaint. *Southgate Dev. Corp.*

*v. Columbia Gas Trans. Corp.*, 48 Ohio St.2d 211 (1976), paragraph one of the syllabus. Rather, a trial court may consider any facts established in the record. *Cirino v. Ohio Bur. of Workers' Comp.*, 153 Ohio St.3d 333, 2018-Ohio-2665, ¶ 17. Appellate courts review dismissals pursuant to Civ.R. 12(B)(1) *de novo*. *State ex rel. Ohio Civ. Serv. Emps. Assn. v. State*, 146 Ohio St.3d 315, 2016-Ohio-478, ¶ 12.

Analysis

**{¶27}** In this case, the Board filed its appropriation petition on November 16, 2018. According to Revised Code 163.05(A), an appropriation petition has to include, *inter alia*, "A description of each parcel of land or interest or right therein sought to be appropriated, such as will permit ready identification of the land involved[.]" Notably, Revised Code 163.05(A) does not require a "metes and bounds" description of the land sought to be taken; rather, it requires what courts have essentially determined is a lower standard of a description that will permit ready identification of the land. *See Madison Cty. Bd of Commrs. v. Bell*, 12th Dist. Madison No. CA2005-09-036, 2007-Ohio-1373, ¶¶ 87-88, citing *Trimble Twp. Waste Water Treatment Dist., v. Cominsky*, 4th Dist. Athens No. CA1535, 1993WL112562.

**{¶28}** The appropriation petition filed in this case stated that the location of the property at issue is, "E. Riverview Avenue (fka Route 424 (Rear)), Napoleon,

Case No. 7-19-11

Henry County, Ohio (Permanent Parcel No. 28-070064.0000), and the legal description of the property to be acquired is attached hereto as **Exhibit "1".**" (Emphasis sic.) (Doc. No. 1). The referenced attached exhibit described the land, in pertinent part, as follows.

> **Situated in the State of Ohio, County of Henry, City of Napoleon, being a part of Section 7, Town 5 North, Range 7 East, and also being on the left and right side of the centerline of right of way of Industrial Drive, as shown on a centerline survey plat made in 2015, for the Henry County Engineer, titled "HEN-NEW BRIDGE" and bounded and described as follows.**
>
> **Commencing at a 5/8 inch diameter capped iron pin found on the north-south centerline of said Section 7 45.92 feet North 00 degrees 58 minutes 07 second East, along said north-south centerline of Section 7 from the Transit Line of the Miami & Erie Canal, being 86.20 feet right of Riverview Avenue centerline of right of waystation 591+64.17, said point also being South 00 degrees 58 minutes 07 seconds West, 3021.35 feet, along said north-south centerline from the North Quarter Corner of said Section 7;**
>
> 1) **Thence South 00 degrees 58 minutes 07 seconds West a distance of 94.88 feet along said north-south centerline of Section 7 to a northwesterly property corner of the Grantor being 157.60 feet right of Riverview Avenue centerline of right of way Station 591+.0033;**
>
> 2) **Thence North 52 degrees 11 minutes 43 seconds East a distance of 138.51 feet, along the northerly property line of the Grantor to a ¾ inch diameter capped iron pin set, 162.49 feet right of Riverview Avenue centerline of right of way Station 592+42.74, also being 145.00 left of Industrial Drive centerline of right of way Station 49+06.71 and being the TRUE POINT OF BEGINNING;**

-13-

3) **Thence North 52 degrees 11 minutes 43 seconds East a distance of 365.57 feet, continuing along said northerly properly line of the Grantor, to a ¾ inch diameter capped iron pin set at the northeasterly property corner of the Grantor, 158.86 feet right of Riverview Avenue centerline of right of way Station 596+18.91, also being 219.37 feet right of Industrial Drive centerline of right of way Station 48+77.09;**

4) **Thence South 44 degrees 31 minutes 40 seconds East a distance of 105.32 feet, along the easterly property line of the Grantor to a ¾ inch diameter capped iron pin set at the southeasterly property corner of the Grantor, 262.80 feet right of Riverview Avenue centerline of right of way Station 596+36.50, also being 223.18 feet right of Industrial Drive centerline of right of way Station 47+71.84;**

5) **Thence South 52 degrees 29 minutes 17 seconds West a distance of 294.27 feet, along said southerly property line being the northerly riverbank of the Maumee River, to a ¾ inch diameter capped iron pin set 70.00 feet left of Industrial Drive centerline of right of way Station 47+97.18;**

6) **Thence North 76 degrees 51 minutes 14 seconds West a distance of 132.75 feet to the POINT OF BEGINNING.**

**The above described area is contained within Henry County Auditor's Permanent Parcel number 2807.00640000 and contains a gross area of .7857 acres more or less.**

(Doc. No. 1, Ex. 1).[4] The preceding identification of the land provides a "metes and bounds" description of the property to be appropriated even though such a description is not specifically required under R.C. 163.05(A).[5]

---

[4] This does not constitute the exhibit in its entirety.

[5] Black's Law Dictionary defines "metes and bounds" as "The territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties[; or] 2. The method of describing a tract by limits so measured, esp. when the descriptions of the limits are arranged as a series of instructions that, if followed, result in traveling along the tract's boundaries."

{¶29} Despite the thorough identification of the land sought to be appropriated, the Rettigs argue that the discovery of a bald eagle's nest on the land rendered the property description inadequate, because it was possible (or in their contention, probable) that the presence of the nest would alter where the bridge construction could be conducted, or that the presence of the nest might alter what land actually needed to be appropriated.

{¶30} There is no dispute in this case that while this case was pending the parties learned that there was a bald eagle's nest on the subject property. The Henry County Engineer testified the he was aware the nest existed, though the exact location was unknown, and that he had informed ODOT that there was a nest on the property. The Henry County Engineer testified that they were looking into "what the spacing requirements would be and whatever time frames may be of what effect it might have on the bridge. So they're looking into * * * what type of windows construction can happen and can't happen." (Schumm Depo. at 9).

{¶31} The Rettigs claim that the presence of the bald eagle's nest will mean that construction cannot occur within 660 feet of the nest, and that the location of the appropriation might have to be altered, rendering the metes and bounds description inaccurate. The Rettigs argue that this is especially true since no survey had been conducted to find exactly where the nest was, particularly in relation to the build-site.

{¶32} Contrary to the Rettigs' argument, there is absolutely no indication in the record that the presence of the bald eagle's nest on the property will completely obstruct the building of the road and bridge as planned or alter the location of the appropriation. Rather, the record indicates, through the testimony of the Henry County Engineer, that the presence of the nest impacts *when* construction could occur, not *if* it could occur. (Schumm Depo. at 9); (Owen Depo at 11-12).

{¶33} Moreover, the Board cites us to ODOT's "General Notes," which indicate that where there is an active bald eagle nest near a construction site, no work can occur within 660 feet of the nest from January 10 through September 30. This would seem to leave an unfettered period of construction. Regardless, the constructability issues were being addressed with ODOT. (Owen Depo at 11-12); (Schumm Depo at 9). There is no case authority showing that the presence of the bald eagle's nest renders the take unlawful in this instance and the Rettigs have provided no authority to suggest otherwise.

{¶34} Furthermore, the presence of the bald eagle's nest on the property does not alter the "metes and bounds" description of the actual property, which was clearly compliant with R.C. 163.05(A). Therefore we cannot find that the trial court erred in denying the Rettigs' motion to dismiss on the issue of the property description being inadequate or inaccurate.

{¶35} The Rettigs next contend that the Board's financial offer did not constitute a "good-faith offer" pursuant to R.C. 163.04 because the presence of the bald eagle's nest could impact the land that needed to be taken for the project.

{¶36} Pursuant to Revised Code 163.04(B), "an agency shall provide an owner with a written good faith offer to purchase the property. The agency may revise that offer if before commencing an appropriation proceeding the agency becomes aware of conditions indigenous to the property that could not reasonably have been discovered at the time of the initial good faith offer * * *." The good faith offer is based on an appraisal, which is guided by Revised Code 163.04(C). It reads as follows.

> **An agency may appropriate real property only after the agency obtains an appraisal of the property and provides a copy of the appraisal to the owner or, if more than one, each owner or to the guardian or trustee of each owner. * * * The agency shall provide the copy or summary of the appraisal to an owner, guardian, or trustee at or before the time the agency makes its first offer to purchase the property.**

{¶37} In this case, the Board provided a written appraisal of the property to be taken that was in excess of 130 pages. It was prepared by Martin & Wood Appraisal Group, Ltd. The appraisal, and subsequent offer, contained a proposed amount for the appropriated land specifically ($27,500), and an amount for damage

to the residue that would be retained by the Rettigs ($6,900), for a total appraisal of $34,400.[6]

**{¶38}** After the discovery of the bald eagle's nest, the Rettigs' filed a motion to dismiss the appropriation petition claiming the "good-faith" offer was no longer valid. There is no factual or legal support for the Rettigs' claim. Again, there is no indication that the appropriated land is going to change as a result of the presence of the bald eagle's nest. If the Rettigs wish to argue that the presence of the bald eagle's nest increases the value of the subject property, they are free to obtain an appraisal and argue that before a jury. The presence of the bald eagle's nest does not render the good-faith offer invalid in this matter as there is no indication that the appropriated land has changed, therefore this argument is not well-taken.

**{¶39}** Next, the Rettigs take issue with the trial court's finding that even if the appropriation petition was somehow defective, it could be amended. Notably, the finding by the trial court that the appropriation petition could be amended was an alternative, surplus finding of the trial court and has no bearing on the matter as the trial court had already found no merit to the Rettigs' motion to dismiss. The trial court did not actually find that the petition needed to be amended in this matter, thus the statement is dicta.

---

[6] According to the appraisal's summary sheet, the entire value of the Rettigs' property was approximately $80,000 before the taking.

{¶40} Nevertheless, Revised Code 163.12(C) permits a trial court to amend any defect or informality in appropriation proceedings, and there is some case authority supporting the trial court's claim that an eminent domain petition could be amended. *See Madison Cty. Bd of Commrs. v. Bell*, 12th Dist. Madison No. CA2005-09-036, 2007-Ohio-1373, ¶¶ 79-82. Regardless, the trial court's finding was superfluous, and actually has no bearing on this case because there is no need for an amendment at this time.

{¶41} In sum, the Rettigs repeatedly assert that the appropriation petition was not in compliance with various provisions of R.C. Chapter 163, which they contend would deprive the trial court of subject matter jurisdiction in this case. However, as the Rettigs cannot demonstrate a defect in the appropriation petition, we cannot find that the trial court erred in denying the Rettigs' motion to dismiss for any purported lack of compliance with R.C. Chapter 163. Therefore the Rettigs' arguments are not well-taken, and their first assignment of error is overruled.

*Second Assignment of Error*

{¶42} In their second assignment of error, the Rettigs argue that the trial court erred by granting summary judgment in favor of the Board on the Rettigs' counterclaims for a declaratory judgment and preliminary/permanent injunctions. More specifically, the Rettigs contend that the appropriation of their land was an illegal use of the Board's eminent domain power because the bridge was not actually

for public use. The Rettigs also argue that the traffic data relied upon to support the project was out-of-date, that the action was impermissibly for economic development purposes *only*, and that the trial court erred by citing this court's decision in *Tracey v. Preston*, 3d Dist. Logan 114 Ohio App. 206 (1960) *affirmed on appeal* by *Tracey v. Preston*, 172 Ohio St. 567 (1962), for support because the case predated amendments to Revised Code Chapter 163.

### Standard of Review

{¶43} We review a trial court's decision on a motion for summary judgment *de novo*. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "Thus, this court conducts an independent review of the evidence and arguments that were before the trial court without deference to the trial court's decision." *Allstate Ins. Co. v. Bowman*, 3d Dist. Shelby No. 17-18-05, 2018-Ohio-4171, ¶ 11, *appeal not allowed*, 154 Ohio St.3d 1510, 2019-Ohio-601, citing *Brown v. Cty. Commrs. of Scioto Cty.*, 87 Ohio App.3d 704, 711 (4th Dist.1993) (citation omitted).

{¶44} Pursuant to Civ.R. 56(C), summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the

nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). "When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims." *Lundeen v. Graff*, 10th Dist. Franklin No. 15AP-32, 2015-Ohio-4462, ¶ 11, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once the moving party meets its initial burden, the nonmovant must set forth specific facts demonstrating a genuine issue for trial. *Dresher* at 293.

Analysis

{¶45} From the moment the Rettigs filed an answer and counterclaim in this appropriation action, they have asserted that there is a conspiracy between the Board and Campbell's. The Rettigs contend essentially that the bridge and road have no purpose other than serving Campbell's, and that the location crossing the Rettigs' property had long been established as illustrated by the City of Napoleon's "comprehensive master plan" from 2003, which showed a potential bridge being built at the location that was ultimately selected years later after the feasibility study.[7] In addition, the Rettigs contend that various presentations given to Campbell's in an attempt to establish a public-private partnership show that the City

_____

[7] Testimony indicated that this early proposed location in the "master plan" was not final, and that was made clear by the feasibility study, which considered numerous options to place the bridge.

of Napoleon and Henry County were trying to appease the largest employer in the area by building the bridge.[8]

{¶46} In crafting a legal argument that this appropriation action exceeded the Board's authority, the Rettigs contend that the road and bridge were not actually for a "public use" because R.C. 163.01(H)(1) excludes from "public use" takings that are for conveyance to a private commercial enterprise, for economic development, or solely for the purpose of increasing public revenue.[9] However, the actual evidence does not demonstrate that R.C. 163.01(H)(1) controls here because the road and bridge *are not being built to be conveyed to Campbell's*, and the road and bridge *are not purely for economic development*.

{¶47} While the Rettigs may speculate that there is some nefarious scheme in place to take their property and turn it over to Campbell's, the record does not support this claim whatsoever.[10] Although the testimony did undoubtedly indicate that the new road and bridge would benefit Campbell's and the truck traffic going to and from the Campbell's facility, the testimony is clear and consistent that there

---

[8] Testimony indicated that the presentations were proposals in the hopes of securing some funding from Campbell's. (Schumm Depo at 76).

[9] In the event that R.C. 163.01(H)(1) is implicated, there are exceptions to the rule. However, as stated *infra* R.C. 163.01(H)(1) is not implicated here.

[10] The Rettigs see a conspiracy in the City of Napoleon's offers to potentially rename the bridge or Industrial Drive in the event that Campbell's supplied a significant amount of money toward the project. However, the Rettigs do not seem to argue that there is a conspiracy involving the State government, which approved TRAC funding and made requests to get private donations. Even if they did, such an argument is not founded in the record. Moreover, while the Rettigs contend that Campbell's was going to be a major contributor to this project, Campbell's pledged less than one-third of what was sought from them, ultimately less than $500,000 out of a suspected $14.5-$16.5 million project. This amounts to less than 4% of the expected cost of the bridge.

were numerous businesses that would also benefit from the bridge such as "Keller Trucking" and "Silgan Can," (Hastedt Depo. at 35, 97). In addition, there were indications that other businesses on the north side of the river would benefit as well such as a cold storage warehouse, "MBM," "Advanced Drainage," and "JACs." (*Id.* at 97).

{¶48} Nevertheless, separate from economic improvement for various employers, witnesses testified that the new bridge would alleviate traffic in downtown Napoleon—particularly truck traffic—, that the bridge would reduce crashes, reduce air pollution, and that it would reduce emergency response times to and from the hospital, which was on the north side of the river.[11] (Hastedt Depo. at 55, 63, 98, 102); (Hartline Depo. at 53, 55, 73-74, 77); (Schumm Depo. at 37).

{¶49} Moreover, contrary to the Rettigs' claim that the road and bridge would not be for public use, pursuant to R.C. 163.01(H)(2), appropriations for roads are *presumed to be for public use*. *See also* Baldwin's Oh. Prac. Real Est. § 54:1.53. In fact, despite the Rettigs' distortions of the record, *all* witnesses who testified regarding the road and bridge project indicated that the road and bridge would be toll-free and open to the public. (Hastedt Depo. at 24); (Schumm Depo. at 94). Furthermore, we find the Rettigs' claim that the new road will "dead-end" at

---

[11] Even where a witness stated that economic development was a "primary" reason for the bridge, he still stated that another reason was to "keep traffic from downtown" and later clarified economic was not referring just to Campbell's. (Hastedt Depo. at 23).

Campbell's to be *at best* entirely misleading and at worst wholly disingenuous considering that the road and bridge would connect two existing public roads. For all of these reasons the Rettigs' claim that the appropriation was not for a "public use" is not well-taken.

{¶50} Next, the Rettigs contend that it was not established in this matter that the appropriation action was "necessary." Pursuant to R.C. 163.021(A), "No agency shall appropriate real property except as necessary and for a public use. In any appropriation, the taking agency shall show by a preponderance of the evidence that the taking is necessary and for a public use."

{¶51} Importantly, according to R.C. 163.09(B)(1)(a), "A resolution or ordinance of the governing or controlling body, council, or board of the agency declaring the necessity for the appropriation creates a rebuttable presumption of the necessity for the appropriation if the agency is not appropriating the property because it is a blighted parcel or part of a blighted area or slum."

{¶52} In this case, the Board passed a unanimous resolution indicating that the appropriation action for the bridge and road were necessary for public use. Thus based on R.C. 163.09(B)(1)(a), there was a rebuttable presumption that the appropriation was, in fact, necessary.

{¶53} The Rettigs feel that they have rebutted the presumption of necessity in this matter by attacking the traffic survey that was used as part of the feasibility

study, claiming that the study was, *inter alia*, out-of-date. The Rettigs also contend that any prospective reduction in traffic was entirely speculative. However, the feasibility study concluded that a new bridge *would* reduce traffic congestion, and any prospective look at a reduction in traffic is bound to be somewhat speculative, if reasonably foreseeable. Regardless, a professional engineer indicated that present and future traffic was evaluated in the feasibility study. (Hartline Depo. at 19). Moreover, we find that the record supports the presumption of necessity in this case, as there were numerous reasons listed as to why the bridge and road needed to be built such as: economic development, reduction of traffic congestion in Napoleon, reduction of crashes, and ease of access to emergency services. Thus the Rettigs' claim that the necessity of the appropriation action was not established is not well-taken.

{¶54} Finally, the Rettigs take issue with the trial court's citation of an older case from this court, *Tracey v. Preston*, 3d Dist. Logan 114 Ohio App. 206 (1960), because it predated 2007 amendments to R.C. Chapter 163. The Rettigs feel that the decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), and amendments to R.C. 163.021 in 2007, established that a taking has to be for public use and that public use does not include a taking that is for conveyance to a private commercial enterprise, economic development, or solely for the purpose of increasing public revenue. Again, this argument is misguided because the road and bridge are *not*

being conveyed to a private entity, and there are other purposes for the road and bridge beyond economic, so the referenced statute and *Kelo* are not relevant.

{¶55} The trial court's citation of the *Tracey* opinion is thus largely irrelevant and is not inapposite of any decision that was made here. Nevertheless, *Tracey* can provide some passing guidance reiterating what is already stated in R.C. 163.01(H)(2), that taking of land to make a public road is presumably for a public use.

{¶56} In sum, in response to the Board's appropriation action, the Rettigs filed counterclaims for a declaratory judgment and for injunctions alleging abuse of power and that the appropriation was solely for the benefit of Campbell's. After reviewing the record, the trial court found that the project had a public purpose and was not for the exclusive use of a commercial enterprise. Upon our review of the trial court's decision, we also find that there is no genuine issue of material fact in this matter, that there is no abuse of power on the part of the Board, no conspiracy between the Board and Campbell's, and that an injunction is not appropriate. Therefore we find that the trial court properly granted summary judgment to the Board on the Rettigs' counterclaims. Accordingly, the Rettigs' second assignment of error is overruled.

*Conclusion*

**{¶57}** For the foregoing reasons the Rettigs' assignments of error are overruled and the judgment of the Henry County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**